# United States Court of Appeals
## For the First Circuit

No. 01-2139

CHRISTINE BONAS ET AL.,

Plaintiffs, Appellees,

v.

TOWN OF NORTH SMITHFIELD ET AL.,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary M. Lisi, U.S. District Judge]

Before

Selya and Lipez, Circuit Judges,

and Doumar,* Senior District Judge.

Marc DeSisto, with whom Kathleen M. Powers, and DeSisto Law Offices were on brief, for appellants.
Howard A. Merten, with whom Eric M. Sommers and Vetter & White were on brief, for appellees.

September 19, 2001

_____
*Of the Eastern District of Virginia, sitting by designation.

**SELYA, Circuit Judge.** In this action for declaratory and injunctive relief, four registered voters residing in North Smithfield, Rhode Island (the Town) seek to compel the holding of an election in November of 2001. The plaintiffs claim that the Town's charter requires such an election and that the refusal of the defendants — the Town and various Town plenipotentiaries — to comply with the charter abridges the plaintiffs' First Amendment rights to vote and to associate.[1] In an effort to parry this thrust, the defendants make four main arguments. First, they question the justification for federal court intervention. Second, they point to a 1998 referendum, approved by the voters of North Smithfield, which switched municipal elections to even-numbered years starting in the year 2002, and assert that this vote erases any need for an election in 2001. Third, the defendants claim that the voters ratified the plan to forgo the 2001 election during the 1999 election (in which the ballot mentioned lengthened terms for certain elected officials). Finally, the defendants interpose a series of equitable defenses — waiver, estoppel, and the like.

---

[1]The proscriptions of the First Amendment are made applicable to the states, and thus to local governments, by the provisions of the Fourteenth Amendment. See City of Ladue v. Gilleo, 512 U.S. 43, 45 n.1 (1994).

The district court found no merit in the defendants' contentions, see Bonas v. Town of North Smithfield, No. 01-241, slip op. at 11-12 (D.R.I. Aug. 20, 2001), and ordered the Town to hold a regular election for town council and school committee in 2001. On this expedited appeal, the defendants renew the same arguments that the district court rejected. We heard oral argument on September 14, 2001, and ruled ore tenus that the Town must hold the election in question. This opinion explains the basis for our ruling. All applicable time periods (e.g., the time for filing petitions for rehearing or rehearing en banc) shall run from the date of this opinion rather than from the date of our oral advisory.

## I. BACKGROUND

In 1998, the voters of North Smithfield affirmatively answered four related referendum questions designed to transition the Town from an odd-year election cycle to an even-year cycle. The text of these referendum questions (three of which refer to the amendment of specified sections of the Town's charter) follows:

> Article II, Section 2 - Shall the regular town election be held the first Tuesday after the first Monday in November in even numbered years beginning in the year 2002?
> * * *
> Article V, Section 1 - Shall the term of the town administrator begin on the first day of December next following his/her election and

-4-

extend to November 30th of the year 2002 and every two years thereafter?

*      *      *

Article XIV, Section 1 - Shall school committee members be elected at large at the regular biennial elections in even numbered years, keeping their staggered terms beginning in the year 2002 and serve for a term of four (4) years and until his/her successor is elected and qualified?

*      *      *

Shall all other provisions of the charter relating to the election, such as declarations, endorsements, nomination papers and primary date, be amended to be consistent with the state election calendar?

At the time of the referendum, Article II, section 2, of the Town's charter stated that "a regular town election shall be held on the first Tuesday after the first Monday in November in odd-numbered years." The charter further provided that town council members would be chosen at these "regular town election[s]," and Article IV, section 1, mandated that town councillors, once elected, would "serve for a term of two (2) years, such term to begin on the first day of December next following their election, or until their successors are elected and qualified." Article XIV, section 1, decreed that each school committee member "shall be elected at large at the regular biennial elections in odd-numbered years to serve for a term of four (4) years and until his successor is elected and qualified," and staggered the terms so that three of the five

school committee slots were filled in one regular biennial election and the remaining two were filled in the next.

The charter amendments resulting from the 1998 referendum make clear that the first even-year town election is to take place in 2002. Those amendments do not explicitly mention any changes in the election schedule leading up to that year, other than a one-time lengthening of the Town Administrator's term (which would run from 1999 to 2002). Had the amendments contained similar language with respect to the town council and school committee terms, this case would not have seen the light of day.

Three school committee members had been elected in 1997, each to serve a four-year term in accordance with the charter provisions in effect at that time. Two school committee seats, and all the town council seats, were up for election in 1999. Despite the absence of any explicit voter mandate approving lengthened terms for town council and school committee members, the official ballot for the 1999 municipal election listed the terms for these offices as three and five years, respectively.[2] These inscriptions appeared out of thin air:

_____

[2]The candidates for town council were listed beneath the heading "TOWN COUNCIL Three Year Term Vote for any 5." Similarly, the candidates for school committee were listed beneath the heading "SCHOOL COMMITTEE Five Year Term Vote for any 2."

neither the town council nor the board of canvassers had taken any official action aimed at lengthening the terms for these offices, and the meeting minutes for the relevant periods do not reflect that the matter was even considered. Notwithstanding this lack of documentation, however, the defendants assert — for what it may be worth — that this one-time extension was openly discussed in various official venues both before and after the referendum; that one candidate for office in the November 1999 election distributed a flyer stating that "[t]he next election will be held in November 2002"; and that much of the electorate plainly understood that the extension was part of the transition package.

Relying on this "understanding" and on the language that appeared on the 1999 ballot, the defendants decided not to hold a municipal election in 2001. The plaintiffs — four registered voters in the Town of North Smithfield who desire to exercise their right to vote for town council and school committee in the 2001 election — maintain that they learned of the Town's intention to forgo the election in February of 2001, at which point they unsuccessfully petitioned the town council and board of canvassers for redress.[3]

---

[3]The plaintiffs also sought relief before the state Board of Elections. The Board declined to hear the case, concluding that it lacked jurisdiction to order the Town to hold an election.

Invoking 42 U.S.C. § 1983, the plaintiffs then filed suit in the federal district court, claiming a denial of their right to vote and their right to political association under the First and Fourteenth Amendments to the United States Constitution. The district court heard the matter on cross-motions for summary judgment, filed after the parties had stipulated to the pertinent facts. Ruling from the bench on August 3, 2001, the district court granted the plaintiffs' motion, denied the cross-motion, and ordered the defendants to hold a regular town election in the year 2001 for town council and three school committee seats. The court further explained its rationale in a written decision issued two weeks later. This appeal followed.

## II. JURISDICTION

The first — and most formidable — obstacle in the plaintiffs' path is the question of federal jurisdiction.[4]

---

[4]The defendants also purport to challenge the plaintiffs' standing, claiming that the plaintiffs cannot satisfy the "redressability" prong of the standing inquiry. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (requiring injury in fact, causation, and redressability for purposes of Article III standing). Their argument boils down to an assertion that a federal court cannot, or should not, order the remedy that the plaintiffs request. But the defendants misconstrue the applicable legal principles. Redressability requires only the "'substantial likelihood' that the requested relief will remedy the alleged injury in fact." Vermont Agency of Natural Res. v. U.S. ex rel. Stevens, 529 U.S. 765, 771 (2000). Understood in this light, the requirement is easily met

Federal courts are courts of limited jurisdiction, and therefore must be certain that they have explicit authority to decide a case.  See Irving v. United States, 162 F.3d 154, 160 (1st Cir. 1998) (en banc).  Thus, we subject the  plaintiffs' choice of a federal forum to careful scrutiny.

An earlier election case, Griffin v. Burns, 570 F.2d 1065 (1st Cir. 1978), sets forth the analytic framework.  First, because the jurisdictional statute, 28 U.S.C. § 1343(3), parrots the text of 42 U.S.C. § 1983, federal jurisdiction hinges upon the existence vel non of a substantial claim under section 1983. Griffin, 570 F.2d at 1070.  In other words, federal courts have jurisdiction over claims arising out of a state or local electoral dispute if, and to the extent that, the complaint limns a set of facts that bespeaks the violation of a constitutionally guaranteed right.

It is certain that the right to vote — the wellspring of all rights in a democracy — is constitutionally protected. The Supreme Court long ago described that right as a "fundamental political right."  Yick Wo v. Hopkins, 118 U.S. 356, 370 (1886).  Thus, the Constitution "protects the right of

---

by the plaintiffs:  the feared injury is the denial of the right to vote should the defendants fail to hold the regularly scheduled election.  There is little doubt that ordering the Town to hold the election would palliate that alleged transgression.

all qualified citizens to vote, in state as well as in federal elections." Reynolds v. Sims, 377 U.S. 533, 554 (1964). Since municipalities are political subdivisions of state government, this means that the right to vote in local elections (including referenda elections) is constitutionally protected. See Griffin, 570 F.2d at 1075.

Despite this bedrock federal interest, a federal court may not inject itself into the midst of every local electoral dispute. Election law, as it pertains to state and local elections, is for the most part a preserve that lies within the exclusive competence of the state courts. Powell v. Power, 436 F.2d 84, 86 (2d Cir. 1970). Thus, with only a few narrow and well-defined exceptions, federal courts are not authorized to meddle in local elections. Consequently, they normally may not superintend the step-by-step conduct of local electoral contests or undertake the resolution of "garden variety election irregularities." Griffin, 570 F.2d at 1076.

It is our task, then, to separate wheat from chaff, and to determine whether this case fits into one of the isthmian exceptions to this general rule of non-intervention. The first, and most developed, justification for federal court intervention exists when a discrete group of voters suffers a denial of equal protection. See, e.g., Reynolds, 377 U.S. at 558. Because

-10-

there is no evidence that a particular category of North Smithfield voters will suffer disproportionately from the defendants' decision to forgo the 2001 election, this case does not fit that mold.

Federal court involvement also may be proper when a denial of substantive due process occurs, that is, "[i]f the election process itself reaches the point of patent and fundamental unfairness." Griffin, 570 F.2d at 1077. We found such a parlous state of affairs in Griffin, when Rhode Island election officials, relying on a ruling of the state supreme court, made an after-the-fact decision not to count absentee and shut-in ballots that had been cast in a primary election. Because that decision changed the rules at the end of the game, resulting in the annulment of an entire class of ballots that likely would have been outcome-determinative, we upheld the district court's order for a new election in the affected ward. Id. at 1080.

Although some subsequent cases have distinguished Griffin, see, e.g., Henry v. Connolly, 910 F.2d 1000, 1003 (1st Cir. 1990) (distinguishing Griffin in respect to the scuttling of a ballot initiative for failure to comply with state-law signature prerequisites); Partido Nuevo Progresista v. Perez, 639 F.2d 825, 828 (1st Cir. 1980) (distinguishing Griffin, in a

-11-

ballot mismarking case, on the ground that the claimed injury was indirect vote dilution as opposed to direct disenfranchisement), none have weakened its core holding: that, in those few cases in which organic failures in a state or local election process threaten to work patent and fundamental unfairness, a colorable claim lies for a violation of substantive due process (and, hence, federal jurisdiction attaches). Other courts also have struggled with plotting the boundaries of federal jurisdiction in this area, but, in the main, have adhered (at least approximately) to <u>Griffin</u>'s core holding. <u>See</u>, <u>e.g.</u>, <u>Marks</u> v. <u>Stinson</u>, 19 F.3d 873, 888-89 (3d Cir. 1994) (citing <u>Griffin</u> and decertifying the winner of a local election in the face of massive absentee ballot fraud); <u>see</u> <u>also</u> <u>Hennings</u> v. <u>Grafton</u>, 523 F.2d 861, 864 (7th Cir. 1975) (suggesting that "wilful conduct which undermines the organic processes by which candidates are elected" may violate the constitutional right to vote).

We do not pretend that it is a simple matter to segregate run-of-the-mill electoral disputes from those that appropriately can be characterized as harbingers of patent and fundamental unfairness. <u>See</u> <u>Navedo</u> v. <u>Acevedo</u>, 932 F.2d 94, 95 (1st Cir. 1991) (declining to find that asserted election irregularities reached the level of federal constitutional

-12-

violations, but noting that "it is not always easy to draw the line reflected in the differing outcomes of [the decided cases]").  Like beauty, fundamental fairness frequently lies in the eye of the beholder.  But the Constitution does not ensure a bright-line rule for every situation.  In respect to federal jurisdiction over claims arising out of a state or local election dispute, each case must be evaluated on its own facts.

In this chiaroscuro corner of the law, one thing is clear:  total and complete disenfranchisement of the electorate as a whole is patently and fundamentally unfair (and, hence, amenable to rectification in a federal court).  Here, our evaluation of whether such widespread disenfranchisement has occurred starts — and ends — with  a question of state law:  Do state and local rules mandate an election in North Smithfield for the offices of town council and school committee in the fall of 2001?  Assuming that such an election is required — a topic to which we shortly shall return — the Town's refusal to hold it would work a total and complete disenfranchisement of the electorate, and therefore would constitute a violation of due process (in addition to being a violation of state law).

In deciding that cases of total and complete disenfranchisement of the electorate as a whole are federally justiciable, we find Duncan v. Poythress, 657 F.2d 691 (5th Cir.

-13-

Unit B Sept. 1981), particularly helpful.  In that case, the court held that the refusal of Georgia state officials to call a special election to fill a position on the Georgia Supreme Court violated the electors' constitutional right to vote.  Id. at 693.  The court reasoned that, since Georgia law required a special election following the resignation of any elected official, the governor's appointment of a successor to a retiring justice constituted a violation of substantive due process.  Id. at 699-700 (citing Griffin, 570 F.2d at 1078-79).

Along with the Duncan court, we "can imagine no claim more deserving of constitutional protection than the allegation that . . . officials have purposely abrogated the right to vote . . . ."  Id. at 704.  Here, as in Duncan, the decision to dispense with an election was deliberate.  If the decision is allowed to stand, every resident of North Smithfield will be deprived of his or her right to vote for the affected offices. In our judgment, such across-the-board disenfranchisement betokens an utter breakdown of the electoral process.  That extraordinary circumstance is far removed from the "garden variety election irregularities" that courts have held insufficient to support federal intervention.  Griffin, 570 F.2d at 1076.

In concluding that we have jurisdiction to hear and determine this case, we do not open the door to routine federal intervention in state and local elections. This case is the long-odds exception to the general rule of non-intervention. We emphasize that deciding it does not embroil the federal courts in the detailed administration of a local election. The case does not involve "tinkering with the state's election machinery, reviewing petitions, registration cards, vote tallies, and certificates of election for all manner of error and insufficiency." Id. at 1077 (citing Powell, 436 F.2d at 86). The violation is striking — leading, as we have said, to disenfranchisement of the electorate as a whole — and the district court has prudently selected a remedy that allows the electoral machinery to move forward without continuing federal involvement. That remedy simply orders the Town to hold an election in 2001. It is essentially the same as the remedy approved in Griffin, Duncan, and Marks.

To say more on this point would be supererogatory. Based on the foregoing, we hold that the district court appropriately exercised jurisdiction over the plaintiffs' complaint.[5]

---

[5]The possibility of abstention gives us pause, and, time permitting, the district court might have done well to insist, as a matter of comity, that the plaintiffs first exhaust their

-15-

## III.  THE MERITS

It remains for us to examine the provisions of the North Smithfield Town Charter to determine whether, in fact, they require an election in 2001.  The defendants advance two related theories in support of their putative authority to extend the terms of town council and school committee members.  First, they suggest that the 1998 referendum, taken together with existing charter provisions, should be construed to dispense with the 2001 election.  Second, they suggest that the electorate ratified the extension of terms when votes were cast in the 1999 election using an official ballot which indicated that town council and school committee members would serve

---

state-court remedies.  But the defendants do not offer any developed argumentation in support of abstention nor do they appear to have pursued that course with much vigor below. Because issues raised by an appellant but not developed are deemed waived, United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990), we need not probe the point.

In all events, the most plausible abstention doctrine — that contained in R.R. Comm'n v. Pullman Co., 312 U.S. 496 (1941) — is ill-suited to this case.  The relevant charter provisions are clear and they lie on the periphery, rather than at the epicenter, of the state's electoral scheme.  Moreover, the consequences of abstention here would be too grave to accept, because the plaintiffs now do not have time, as a practical matter, to obtain the requested relief from a state court before the presumptive date of the 2001 elections arrives.  See Duncan, 657 F.2d at 697 (explaining that the decision whether to abstain "should include consideration of the rights at stake and the costs of delay pending state court adjudication").

-16-

three- and five-year terms, respectively.  See supra note 2.
Both theories fail.

By its unvarnished terms, the 1998 referendum mandated that the first even-year election take place in 2002, but, except with respect to the office of Town Administrator — an office that the plaintiffs concede should not be up for election in 2001 — did not provide for any changes in the election calendar or terms of office prior to that date.  Sailing headlong into the teeth of this plain language — plain language which is given more bite by the utter absence of any record of official approval of a term extension — the defendants maintain that the intended consequence, all along, was to postpone the 2001 election until 2002.  To buttress this claim, they submit various affidavits to show that this consequence was mentioned both at town council meetings and at an informational meeting, open to the public, held prior to the vote on the referendum.

The interpretation urged by the defendants has a certain superficial appeal.  To transition from an odd-year to an even-year election cycle there must, by necessity, exist at least one irregular term.  Theoretically, either lengthening or shortening the wonted terms of elected officials could serve this purpose.  This does not mean, however, that municipal officials are free to choose the alternative they prefer, which,

unsurprisingly, happens to be the alternative that perpetuates them in office. Because charter amendments must be sanctioned by the voters, R.I. Const. art. XIII, §§ 7-8, we must decide what course the electors of North Smithfield charted in the 1998 referendum vote.

Such an inquiry must start with the language of the 1998 referendum. Where, as here, that language is plain and leads to a sensible result, we may not inquire further. Lopez-Soto v. Hawayek, 175 F.3d 170, 172 (1st Cir. 1999). Insofar as North Smithfield's town council and school committee seats are concerned, the language of the referendum requires that the odd-year election cycle continue undisturbed until the year 2002. Even though the relevant amendments formally took effect on December 1, 1998, those amendments did not provide for any transition period in which the regular odd-year elections were to be canceled or postponed. In the absence of such a bridge, we must assume that the charter continues to require that elections be held in odd-numbered years until 2002, and that the appropriate terms for town council and school committee have not been extended.

Contrary to the defendants' claim, this scheme does not create an administrative nightmare. The five town council members elected in 2001 each will serve for one year. In 2002,

-18-

all the town council seats will be up for election, along with the two school committee seats that were on the ballot in 1999. The three school committee members elected in 2001 will serve until 2004. That seems simple enough.

The defendants posit that the charter forbids such a shortening of the terms of office because it states that a school committee member "shall be elected to serve . . . for a term of four (4) years" and that the town council "shall . . . consist of five (5) members . . . each to serve for a term of two (2) years." This argument proves too much. If we accept the defendants' invitation to treat "shall" as mandatory in this context, then we would have to conclude that the terms of office could be neither reduced nor increased, and so the defendants would be slain by their own sword. To escape from this Procrustean bed, we must conclude that the 1998 referendum's mandate for elections to be held in even-numbered years, beginning in 2002, overrides any contrary provisions of the Town charter and, thus, trumps the original charter provisions stipulating the duration of elected terms. That is perfectly compatible with the fourth referendum question, see supra at 4, in response to which the voters specified that "all other [election-related] provisions of the charter . . . [were to] be

amended to be consistent" with the neoteric even-year election cycle.

The defendants also propose that, in any event, the voters authorized an extension of the elected terms for school committee and town council during the 1999 election because the headings on the official ballot explicitly indicated lengthened terms for those offices. See supra note 2 and accompanying text. This proposition lacks force. The voters of North Smithfield could not have authorized this term extension because the question was never properly placed before them. They did not, for instance, have the option of selecting a two-year term instead of a three-year term for town council members.

That ends this aspect of the matter. We hold that placing the legend on the 1999 ballot indicating lengthened terms of office was an ultra vires act by local officials. See Griffin, 570 F.2d at 1076. Because state law requires that voters approve any changes to the Town's charter, R.I. Const. art. XIII, §§ 7-8, these officials were powerless to manufacture their own authority.

The inevitability of this reasoning is made manifest by a recognition that three school committee members, who were undisputedly elected only for four-year terms in 1997, were not on the ballot at all in 1999. Under the defendants' view, those

-20-

officials would serve five-year terms.  The defendants do not explain how changes on the official ballot in 1999 could elongate the terms of those school committee members, nor can they.

Our conclusion that the defendants had no authorization from the voters to dispense with the 2001 election also resolves the defendants' collateral claim that the plaintiffs somehow waived their right to challenge the Town's decision because the proper time to mount a challenge was either immediately after the 1998 referendum or immediately after the 1999 election. Because neither of these events conferred authority on the defendants to forgo the 2001 election, the plaintiffs were entitled to presume that the election would go forward until they received an unambiguous statement from Town officials to the contrary.  That notification did not occur until February of 2001.  The plaintiffs thereafter acted with reasonable celerity and did not knowingly relinquish their rights.[6]

As a last-ditch measure, the defendants suggest that an extension in officials' terms is permitted by Article IV, section 1, and Article XIV, section 1, of the Town's charter, which provide that officials such as town councillors and school

---

[6]To the extent that the defendants have raised other equitable claims (e.g., estoppel), they are meritless and we reject them out of hand.

committee members may serve "until their successors are elected and qualified."[7]   At most, however, this boilerplate language assures that acts of God or inadvertent bureaucratic delays do not leave Town residents without representation pending the election and certification of new representatives.  It cannot, and does not, provide authority to dispense with the election itself.  To hold otherwise would be to give incumbent elected officials carte blanche to eliminate elections and thus to retain their offices indefinitely.

## IV.  CONCLUSION

We need go no further.  For the reasons stated, we affirm the decision of the district court ordering that an election be held in 2001.  That election shall encompass all town council seats (for one-year terms) and three school committee seats.  To preserve the historical staggering (specifically reaffirmed by the 1998 referendum) and to honor the referendum's directive for even-year elections from and after 2002, each of these school committee members shall be elected for a three-year term.  Consistent with the 1998 referendum, all five town council seats, and the remaining two

---

[7]The 1998 referendum contains somewhat the same language, but only with respect to school committee seats.

school committee seats shall be up for election in the 2002 election.

**<u>Affirmed</u>.**