**WELLS FARGO BANK MINNESOTA, N.A., Plaintiff,**

v.

**EL COMANDANTE CAPITAL CORP., et al., Defendants.**

**No. CIV. 03–1796(RLA).**

United States District Court, D. Puerto Rico.

Aug. 25, 2004.

Alfredo F. Ramírez–MacDonald, Esq., Hermann D. Bauer–Alvarez, Esq.; O'Neill & Borges, San Juan, PR, Mark J. Kalla, Esq.; Dorsey & Whitney, LLP, Minneapolis, MN, for Plaintiff.

Ricardo F. Casellas, Esq., Manuel A. Pietrantoni, Esq., Banco Popular de P. R., Manuel San Juan–De Martino, Esq., San Juan, PR, for Defendants.

### ORDER DENYING MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

ACOSTA, District Judge.

Defendants have moved the court to dismiss this action alleging that plaintiff improperly and collusively created diversity jurisdiction in violation of 28 U.S.C. § 1359. The Court has afforded the parties ample opportunity to conduct discovery on the jurisdictional issues and brief their respective arguments, and is now in a position to adjudicate Defendants' jurisdictional challenge. For the reasons set forth below, we find that Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction is without merit.

### I. PROCEDURAL BACKGROUND

This case concerns a claim for collection of monies pursuant to certain 11¾% First Mortgage notes in the aggregate principal amount of $68,000,000 (the "Notes"), pursuant to a Trust Indenture dated as of December 15, 1993 (the "Indenture"). Prior to the commencement of this litigation, a majority of the holders of the aggregate principal amount outstanding on the Notes (the "Majority Noteholders") removed the original trustee, Banco Popular de Puerto Rico ("BANCO POPULAR"), and appoint-

ed plaintiff, Wells Fargo Bank Minnesota, N.A. ("WELLS FARGO") as successor trustee under the Indenture.

Defendants Housing Development Associates ("HDA") and El Comandante Capital Corporation ("EL COMANDANTE") petitioned the court to dismiss the complaint for lack of subject matter jurisdiction. Specifically, Defendants contend that this Court is divested of subject matter jurisdiction to hear this case, because the diversity of citizenship between plaintiff, WELLS FARGO, a citizen of Minnesota, and defendants HDA and EL COMANDANTE, citizens of Puerto Rico and Delaware, respectively, was improperly or collusively created in violation of 28 U.S.C. § 1359.

WELLS FARGO served its opposition and thereafter, both WELLS FARGO and defendants submitted additional briefs in support of their respective positions.

After the filing of various motions by the parties,[1] the court finds this matter is ripe for disposition and the Motion to Deem Pending Motions Submitted for Adjudication filed by WELLS FARGO (docket No. 73) is hereby **GRANTED**.

## II. RULE 12(b)(1)

Defendants' jurisdictional challenge questions the facts as asserted by WELLS FARGO.

The proper vehicle for challenging a court's subject-matter jurisdiction in this case is not Rule 12(b)(6) but rather Fed. R.Civ.P. 12(b)(1). In ruling on motions to dismiss for lack of subject matter jurisdiction the court is not constrained to the allegations in the pleadings as with Rule 12(b)(6) petitions. The plaintiff's jurisdictional allegations are given no presumptive weight and the court is required to address the merits of the jurisdictional claim by resolving the factual disputes between the parties. Further, the court may review extra-pleading material without transforming the petition into a summary judgment vehicle. *Gonzalez v. United States*, 284 F.3d 281, 288 (1st Cir.2002); *Aversa v. United States*, 99 F.3d 1200, 1210 (1st Cir.1996).

## III. THE FACTS

Defendants requested, and this Court granted, an opportunity to conduct discovery limited to the issue of jurisdiction. Upon conclusion of discovery, the parties supplemented the record before this Court. Based on the documentary evidence and the unsworn statements under penalty of perjury submitted by the parties, this Court finds the following facts uncontested:[2]

---

1. On March 18, 2004, this Court heard oral arguments on the Motion to Dismiss and other pending motions. At this hearing, the Court granted Defendants' request to conduct expedited discovery on the jurisdictional issues which discovery concluded on April 30, 2004. On May 7, 2004, Defendants filed a Motion Supplementing the Record with Jurisdictional Discovery. On June 10, 2004, Wells Fargo filed a Motion Supplementing Wells Fargo's Opposition to Motion to Dismiss for Lack of Subject Matter Jurisdiction and a Statement of Uncontested Material Facts in Support of Opposition to Motion to Dismiss for Lack of Subject Matter Jurisdiction. On July 23, 2004, Defendants sought leave to

reply and tendered a reply on June 28, 2004. WELLS FARGO sought leave to sur-reply and tendered said sur-reply on July 27, 2004.

2. Defendants moved to strike the Unsworn Statement Under Penalty of Perjury by J. ANDREW RAHL, JR., in Opposition to Defendants' Motion to Dismiss dated June 9, 2004 (docket No. **63**, Exhibit 1) and the Unsworn Statement Under Penalty of Perjury by DONALD E. MORGAN, III, in Further Opposition to Defendants' Motion to Dismiss dated June 9, 2004 (docket No. **63**, Exhibit 2), on the basis that the same constitute inadmissible hearsay. Said request is **DENIED**. Although these Statements narrate a number of state-

1. WELLS FARGO is a national banking association organized under the laws of the United States of America with its principal place of business in Minnesota, and as such is a citizen of Minnesota.

2. WELLS FARGO is a successor trustee pursuant to Section 610 of the Indenture, and has duly succeeded Banco Popular, in all respects, as trustee thereunder.

3. Pursuant to Section 512 of the Indenture, WELLS FARGO was directed by the Majority Noteholders to commence this action under Section 503 of the Indenture, and to take such actions as it deems necessary.

4. On or about **December 15, 1993**, EL COMANDANTE executed the Indenture pursuant to which EL COMANDANTE undertook to issue the Notes, the proceeds of which were loaned by EL COMANDANTE to HDA.

5. HDA is a guarantor of EL COMANDANTE's obligations under the Indenture and the Notes.

6. Pursuant to the Indenture and the Notes, EL COMANDANTE and HDA were obligated to pay the accrued interest on the principal balance on the Notes semi-annually, on **June 15** and **December 15** of each year, commencing on **June 15, 1994**.

7. EL COMANDANTE and HDA's performance of their obligations under the Indenture and the Notes are secured by, among other things, the following collateral: (a) two mortgage notes issued by HDA, totaling a principal balance of $68,000,000.00, which in turn are secured by, among other collateral, a first mortgage on real estate property; (b) 1,000 shares of Common Stock of EL COMANDANTE, issued on **October 27, 1993**, and all of the proceeds of said shares; (c) HDA's trademarks (including service marks), accounts, contract rights and other obligations, license agreements with any other party, and all proceeds of any and all of the foregoing; and (d) HDA's interests under a lease between HDA, as lessor, and El Comandante Operating Company, as lessee.

8. According to plaintiff's records, EL COMANDANTE and HDA have failed to tender interest payments on the Notes due since December of 2001. From December 15, 2001 until May 2002, the Majority Noteholders entertained proposals from the Defendants in an effort to reach a

ments made by MR. LUIS CINTRON, of BANCO POPULAR, during a meeting with MR. J. ANDREW RAHL, it is apparent that neither the RAHL Affidavit nor the MORGAN II Affidavit were submitted to prove the underlying truth of the matters asserted by MR. CINTRON. Rather, the same were submitted to demonstrate the assertions' effect on MESSRS. RAHL and MORGAN, and the underlying effect that they had in the decision to remove BANCO POPULAR as successor trustee. *See Weaver v. Tech Data Corp.*, 66 F.Supp.2d 1258, 1265 (D.Fla.1999).

Defendants also moved to strike the Unsworn Statement Under Penalty of Perjury by ROBERT I. LANDAU in Support of Opposition to Motion to Dismiss dated June 7, 2004 arguing it was not previously disclosed by WELLS FARGO. Said document was not encompassed within any of the discovery requests propounded upon WELLS FARGO. Rather, they allege the statement was improperly withheld pursuant to Fed.R.Civ.P. Rule 26(a)(2). We note, however, that WELLS FARGO is not under any obligation to make any such disclosures at this time, as clearly set forth by Fed.R.Civ.P. Rule 26(a)(2)(C), for which reason said request is also **DENIED**.

solution to such default, short of litigation.

9. As a result of the failed attempts to obtain payment of the overdue interest from EL COMANDANTE and HDA, on **May 13, 2002**, pursuant to Section 502 of the Indenture, the Majority Noteholders accelerated the amounts due under the Notes and declared the same immediately due and payable.

10. According to plaintiff's records of the date hereof, and despite such acceleration, neither EL COMANDANTE nor HDA has paid any of the interest, principal or other amounts outstanding on the Notes, which matured on **December 15, 2003.**

11. According to plaintiff's records at this time, EL COMANDANTE and HDA owe the holders of the notes issued pursuant to the Indenture (the "Noteholders") in excess of $80,000,000.00.

12. After the obligations under the Notes were accelerated on **May 13, 2002**, EL COMANDANTE, HDA and the Majority Noteholders engaged in negotiations in an attempt to resolve HDA's and EL COMANDANTE's continuing payment default. The parties entered into a Standstill Agreement ("Standstill Agreement"), as part of which the Majority Noteholders agreed not to commence any litigation against HDA and CCC during the parties negotiations.

13. Despite repeated requests, Defendants refused to provide the Majority Noteholders or their financial advisors and counsel the requisite financial and business information necessary to make an informed evaluation of restructuring options.

14. After it became apparent to the Majority Noteholders that HDA and EL COMANDANTE were not willing to provide the information necessary for the Majority Noteholders to engage in meaningful negotiations, the Standstill Agreement expired by its terms in **August 2002.**

15. Even after the expiration of the Standstill Agreement, the Majority Noteholders continued to negotiate with Defendants well into the **spring of 2003**, in an effort to reach a resolution of the payment defaults short of litigation. BANCO POPULAR was not a party to any of these negotiations.

16. In connection with these efforts, during the first week of **November 2002**, J. ANDREW RAHL, JR., a senior shareholder with ANDERSON KILL & OLICK, PC, counsel to the Majority Noteholders, traveled to San Juan, Puerto Rico, on behalf of the Majority Noteholders. The purpose of said trip was to meet with representatives of EL COMANDANTE, HDA and BANCO POPULAR in an effort to pursue a settlement and, in the event that settlement efforts were unsuccessful, to gauge the experience and qualifications of BANCO POPULAR to exercise remedies under the Indenture on behalf of the Noteholders.

17. While in Puerto Rico, MR. RAHL met MR. LUIS CINTRON, head of the Corporate Trust Department of BANCO POPULAR, together with BANCO POPULAR's outside counsel, MESSRS. JAVIER FERRER, JORGE PEIRATS and EDUARDO ARIAS of the firm of

PIETRANTONI, MENDEZ & ALVAREZ. At this meeting, MR. RAHL asked a number of questions of MR. CINTRON about the nature and extent of BANCO POPULAR's prior experience with public bond defaults, with litigation and other enforcement measures to remedy such defaults, and with taking instructions from a majority of noteholders as to how to proceed under those circumstances.

18. During the aforementioned meeting MR. RAHL learned that BANCO POPULAR had only experienced one other public bond default as a trustee which had occurred several years before, and that the matter had not proceeded to litigation. MR. RAHL also learned that BANCO POPULAR had not previously experienced a situation where a group of noteholders like the Majority Noteholders had instructed it under an indenture default as to how to proceed with enforcement of remedies.

19. The Trust Division of BANCO POPULAR has only been involved in litigation concerning a defaulted indenture once, on or about 1989, and BANCO POPULAR was not required to institute foreclosure proceedings as said matter was resolved between the Noteholders and the issuer of the bonds.[3]

20. During the aforementioned meeting MR. RAHL further learned that the EL COMANDANTE situation was an extremely high profile case with great political sensitivity on the Island, and that every move that the bondholders made could be highlighted in the press and by the Government. He was further advised by BANCO POPULAR of the potential intervention in this matter by the Government of Puerto Rico, in light of the millions of dollars in annual tax revenues that could be lost in the event the racetrack were to close.

21. During the aforementioned meeting MR. RAHL asked MR. CINTRON and his counsel a number of questions about how BANCO POPULAR would conduct itself if it became necessary to pursue litigation or other enforcement actions with respect to EL COMANDANTE. In particular, MR. RAHL inquired about three specific matters of concern which could arise if there was no settlement of this matter: (i) whether and to what extent BANCO POPULAR would require a financial indemnity from the Majority Noteholders before proceeding with enforcement; (ii) whether and to what extent BANCO POPULAR would be willing to defer payment to its counsel during the pendency of any enforcement proceedings until the matter was concluded; and (iii) whether or not BANCO POPULAR would require future instructions to it from the Majority Noteholders to be processed through Depository Trust Company ("DTC"), which is an expensive and time consuming process, before acting upon them.

22. MR. RAHL noted that MR. CINTRON declined to give specific answers to his questions on the above issues for the stated reason that he had never encountered these questions before.

23. MR. RAHL reported the contents of his meeting with BANCO POPULAR's representatives, his obser-

---

3. Sworn Statement of LUIS CINTRON dated April 23, 2004 ¶ 12.

vations and his impressions to the Majority Noteholders.

24. As a result of the foregoing, the Majority Noteholders concluded that BANCO POPULAR lacked the experience and expertise required to represent all Noteholders, particularly in the context of a litigation.

25. Therefore, on **July 15, 2003**, the Majority Noteholders served BANCO POPULAR a Written Action of Bondholders, whereby the Majority Noteholders removed BANCO POPULAR as Indenture Trustee.

26. On **July 17, 2004**, WELLS FARGO accepted the designation as successor Indenture Trustee under the Indenture. WELLS FARGO filed the instant case on **July 22, 2004**.

27. MACKAY SHIELDS, together with the other Majority Noteholders, decided that they would need to replace BANCO POPULAR with an indenture trustee experienced in bond default situations, and which would instill in them the confidence and comfort that noteholder interests would be represented without compromise.

28. The Majority Noteholders determined that they needed an experienced trustee whose personnel understood keenly the fiduciary duties, legal issues and practical considerations in a bond default situation.

29. There are approximately 7 major financial institutions (including WELLS FARGO BANK, WILMINGTON TRUST, BANK OF NEW YORK, DEUTSCHE BANK, HSBC, J.P. MORGAN CHASE, and U.S. BANK) with nationally recognized trust departments known for representing Noteholders throughout the processes and proceedings relating to bond defaults. Among the select group, the Majority Noteholders were most familiar and impressed with WELLS FARGO's reputation and expertise.

30. BANCO POPULAR is not part of this select group, and, by its own admission, lacked the experience essential to represent the Noteholders' position following EL COMANDANTE's and HDA's default.

31. BANCO POPULAR handled the administrative responsibilities of indenture trustee up to EL COMANDANTE's payment default in **December 2001**. However, the payment default completely changed the ministerial role of the trustee in this indenture and the minimum qualifications and expertise required to be taken.

32. It is a generally accepted custom and practice for a successor trustee to be brought in to replace an original trustee of a note issue in default when the original trustee does not have experience in dealing with either the enforcement of remedies in such situations or the directions of an ad hoc noteholder group.

33. The foregoing, in conjunction with MR. RAHL's impressions of BANCO POPULAR, BANCO POPULAR's admitted inexperience in defaulted securities, and the applicable business customs and standards governing defaulted securities, motivated the Majority Noteholder's decision to replace BANCO POPULAR as indenture trustee herein.

34. The decision to replace the indenture trustee in connection with liti-

gation was made regardless of the impact that the decision would have on the jurisdiction of such litigation or upon the precise nature of the action itself. The paramount concern of the Majority Noteholders was that the noteholders of the EL COMANDANTE bonds have an experienced indenture trustee that they could rely upon to prosecute noteholder claims and pursue recoveries through all available means.

35. Despite the fact that Section 609 of the Indenture specifically authorizes the Majority Noteholders to remove a trustee at any time for "any" reason, the reason for the selection of WELLS FARGO was because of its superior expertise in default situations.

36. The business reasons for WELLS FARGO's appointment are apparent and are set forth in multiple uncontested unsworn statements under penalty of perjury, and include: (i) BANCO POPULAR's lack of any relevant experience in bond default situation; (ii) WELLS FARGO's extensive experience in the administration of defaulted securities; (iii) WELLS FARGO's insulation from potential local political and economic pressures that may allow a more dispassionate collection of the amounts due by Defendants to the Noteholders.

37. WELLS FARGO has acted and currently acts as indenture trustee on multiple international securities issues that have been in default and/or involved in bankruptcy proceedings. Following is a partial list of these issues: BETHLEHEM STEEL, BUDGET, BURLINGTON INDUSTRIES, CITY OF BUENOS AIRES, ENRON, FARMLAND, FEDERAL MOGUL, FRUIT OF THE LOOM, HORIZON, PCS MIRANT, PROVINCE OF BUENOS AIRES, REPUBLIC OF ARGENTINA, UNITED AIRLINES, U.S. AIR AND USG.

38. WELLS FARGO's financial stability and experience as an indenture trustee is unquestionable and rank it among the top rated indenture trustees in the market.

39. The pending action is not solely of a local character. The Notes were underwritten by a group of national and local investors, and many of the Noteholders reside outside of Puerto Rico.

## IV. SUBJECT MATTER JURISDICTION

■ Federal courts are courts of limited jurisdiction and hence, have the duty to examine their own authority to preside over the cases assigned. "It is black-letter law that a federal court has an obligation to inquire sua sponte into its own subject matter jurisdiction." *McCulloch v. Velez*, 364 F.3d 1, 5 (1st Cir.2004). *See also*, *Bonas v. Town of North Smithfield*, 265 F.3d 69, 73 (1st Cir.2001) ("Federal courts are courts of limited jurisdiction, and therefore must be certain that they have explicit authority to decide a case"); *American Fiber & Finishing, Inc. v. Tyco Healthcare Gp. LP*, 362 F.3d 136, 138 (1st Cir.2004) ("In the absence of jurisdiction, a court is powerless to act.").

■ If jurisdiction is questioned, the party asserting it has the burden of proving a right to litigate in this forum. *McCulloch v. Velez*, 364 F.3d at 6. "Once challenged, the party invoking diversity jurisdiction must prove [it] by a prepon-

derance of the evidence." *Garcia Perez v. Santaella*, 364 F.3d 348, 350 (1st Cir.2004). *See also, Mangual v. Rotger–Sabat*, 317 F.3d 45, 56 (1st Cir.2003) (party invoking federal jurisdiction has burden of establishing it).

Jurisdiction in this action is premised on the diversity of citizenship of the parties as provided for in 28 U.S.C. § 1332. Defendants' jurisdictional challenge is predicated upon 28 U.S.C. § 1359, which reads:

A district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court.

■ Pursuant to this statutory provision, federal courts are divested of jurisdiction if the same was collusively or improperly manufactured. *Kramer v. Caribbean Mills, Inc.*, 394 U.S. 823, 828–829, 89 S.Ct. 1487, 23 L.Ed.2d 9 (1969).

The First Circuit has held—with respect to assignments between parties that are not related—as in the present case, that the plaintiff must show that the reason for the appointment of WELLS FARGO as successor trustee "was legitimate and not pretextual." *Toste Farm Corp. v. Hadbury, Inc.*, 70 F.3d 640, 644 (1st Cir.1995). Presumably, then, a court may not dismiss an action pursuant to Section 1359 unless it finds that the primary or a substantial reason for an assignment is the creation of diversity jurisdiction.

More recently, in *McCulloch v. Velez* the First Circuit ruled that "[t]ransfers or assignments that have the effect of creating federal jurisdiction raise a red flag and, thus, need to be examined with care." 364 F.3d at 6. The court held the inquiry into assignments between related parties "to even more exacting scrutiny [and][b]ecause such assignments are highly suspect, they are presumptively ineffective to cre-

ate diversity jurisdiction." *Id.* (citations omitted). The court concluded that a party attesting to the *bona fide* nature of the transfer or assignment is required to present "a credible showing of a legitimate reason for the transfer, that is, a reason unrelated to the fabrication of federal court jurisdiction." *Id.*

■ The uncontested evidence in the record before this Court shows that, notwithstanding the "red flag" of temporal proximity between the removal of BANCO POPULAR as indenture trustee, the appointment of WELLS FARGO as successor trustee and the filing of the instant complaint, the Majority Noteholders had ample *bona fide* business and practical considerations to effect the removal of BANCO POPULAR and subsequent appointment of WELLS FARGO. Moreover, the uncontested evidence in the record further shows that the creation of diversity of citizenship was neither a primary nor a substantial reason for the appointment of WELLS FARGO as successor trustee.

Thus, it is evident from the record before this Court that in the context of this particular litigation a trustee's skill and experience is not incidental but, rather, is critical to the proper administration of defaulted securities on behalf of noteholders. Once default has occurred, a "prudent" indenture trustee must make countless, discretionary decisions regarding how best to protect the interests of the beneficiaries of the trust.

In this regard, the critical role played by the trustee in default situations has been pointedly described as follows:

The administration of indentures *after default* is the greatest test of the corporate trust officer's skill and expertise.... The consolidation of the corporate trust industry has prompted many

of the remaining trustees to create special default units with the purpose of navigating these waters.... It is impossible to prescribe the exact conduct to be followed in the event of default.

Landau and Krueger, Corporate Trust Administration and Management, 171 (5th ed. 1998) ("Landau on Corporate Trust") (italics added).

As a result of the fundamental shift in the nature of an indenture trustee's duties after an event of default, it is not uncommon for original trustees to be replaced. Indentures customarily provide that a trustee may be removed, and a successor assigned, by an action of a majority of the noteholders. *See,* Landau on Corporate Trusts, at 206. Moreover, "where a new trustee is appointed pursuant to such action, the court will not disturb the discretion of the security holders and must recognize the new trustee so appointed." *Id.* The treatise further states that "[t]he right of removal by the requisite percentage of holders is absolute." *Id.*

██ This right of a majority of noteholders to remove a trustee may be exercised at any time, and with or without cause. *See* Landau on Corporate Trusts, at 56. Moreover, "[b]ecause the [trustee] is supposed to serve their interests, it is quite appropriate that [noteholders] have the power, by majority action, to remove the trustee and substitute another if for any reason they believe their interests are not being properly served." *Id.*

Notwithstanding the foregoing, it is evident that said right cannot be exercised for the improper purpose of manufacturing diversity subject matter jurisdiction. In the case presently before us, the uncontested evidence shows that the Majority Noteholders reasonably desired to replace an indenture trustee having no appreciable

defaulted securities experience with one with vast experience in the administration of defaulted securities. While BANCO POPULAR may have been qualified to perform the pre-default administrative and contractual duties of an indenture trustee, which were primarily of a ministerial nature, it admits that its default administration experience is "still limited" to a single default 15 years previously and which did not require foreclosure and in which the bondholders themselves, not BANCO POPULAR, principally handled the default resolution.[4] In contrast, WELLS FARGO has a separate default administration group staffed by individuals specially trained in performing corporate fiduciary default functions. This court notes that the uncontested and ample evidence in the record shows that a trustee's experience in defaulted securities is a relevant qualification that is evaluated by the holders of said defaulted notes at the time they instruct the trustee to enforce remedies under a defaulted indenture. The uncontested evidence in the record also shows that the applicable business practices encourage the holders of notes under defaulted indentures to remove less experienced trustees and appoint more experienced indenture trustees to enforce their remedies under the defaulted indenture. Thus, whether BANCO POPULAR was theoretically in the same position as WELLS FARGO to exercise the remedies under the Indenture—even when viewed in the context of the timing of said appointment—is not, in itself, sufficient to infer an improper or collusive motive for the appointment of WELLS FARGO as successor indenture trustee.

The foregoing is further underscored by the following uncontested business justifications articulated by WELLS FARGO for

---

4. Sworn Statement of LUIS CINTRON dated April 23, 2004 ¶¶ 11–12.

the removal of BANCO POPULAR and the appointment of WELLS FARGO as successor trustee: (i) BANCO POPULAR's lack of any relevant experience in bond default situations; (ii) WELLS FARGO's extensive experience in the administration of defaulted securities; (iii) WELLS FARGO's insulation from potential local political and economic pressures that may allow a more dispassionate collection of the amounts due by Defendants to the Noteholders.

In sum, the record is devoid of any evidence which makes manifest that the creation of diversity in this case was the motivating factor in the substitution of the indenture trustee. To the contrary, the uncontested evidence in the record shows that the Majority Noteholders' decision was premised on legitimate reasons and designed to protect the Noteholders' rights under the Indenture and the Notes. As such, the foregoing constitute legitimate business justifications divorced from any purpose to create diversity jurisdiction, and, therefore, not within the purview of 28 U.S.C. § 1359.

## V. CONCLUSION

For the foregoing reasons, the Motion to Dismiss for Lack of Subject Matter Jurisdiction filed by Defendants HDA and EL COMANDANTE (docket No. 26) is hereby **DENIED.**[5]

IT IS FURTHER ORDERED that Defendants shall respond to WELLS FARGO's Motion for Summary Judgment

---

5. *See,* Opposition (docket No. **27**); · Reply (docket No. **28**) and Sur-reply (docket No. **29**). *See also,* supplemental motions and additional briefs in support of the parties' respective positions (dockets No. **54, 62** and **63**). Plaintiffs' Motion to Strike (docket No. **59**) is **DENIED.** *See* Opposition (docket No. **61**) and Reply (docket No. **72**). Leave to file

(docket No. 36) **no later than September 30, 2004.**[6]

IT IS SO ORDERED.

reply and/or sur-reply (dockets No. **64, 65** and **68**) is **GRANTED**.

6. In view of our ruling, plaintiffs' Motion Requesting Status Conference (docket No. **53**) and Defendants' requests for a stay (dockets No. **30** and **55**) are **DENIED**.