# United States Court of Appeals
## For the First Circuit

No. 04-2610

PEDRO J. ROSSELLÓ-GONZÁLEZ; LUIS FORTUÑO; MIRIAM RAMÍREZ;
NANETTE GUEVARA; ARNOLD GIL-CARABALLO; LARRY SEILHAMER;
JOSÉ SÁNCHEZ; JUAN F. RAMÍREZ AND JAVIER RODRÍGUEZ-HORTA,
Plaintiffs, Appellees,

v.

SILA M. CALDERÓN-SERRA, individually and in her capacity as
GOVERNOR OF PUERTO RICO; ANÍBAL ACEVEDO-VILÁ; THE INCOMING
GOVERNMENT TRANSITION COMMITTEE; GERARDO A. CRUZ, individually
and in his capacity as a member of the
Puerto Rico Electoral Commission,
Defendants, Appellants.

---

No. 04-2611

PEDRO J. ROSSELLÓ-GONZÁLEZ; LUIS FORTUÑO; MIRIAM RAMÍREZ;
NANETTE GUEVARA; ARNOLD GIL-CARABALLO; LARRY SEILHAMER;
JOSÉ SÁNCHEZ; JUAN F. RAMÍREZ AND JAVIER RODRÍGUEZ-HORTA,
Plaintiffs, Appellees,

v.

THE PUERTO RICO ELECTORAL COMMISSION, A/K/A THE COMMONWEALTH
ELECTION COMMISSION; AURELIO GRACIA-MORALES, individually
and in his capacity as PRESIDENT OF THE PUERTO RICO ELECTORAL
COMMISSION; THOMAS RIVERA-SCHATZ, individually and in his
capacity as a member of the Puerto Rico Electoral Commission;
JUAN DALMAU-RAMÍREZ, individually and in his capacity as a
member of the Puerto Rico Electoral Commission,
Defendants, Appellants.

---

No. 04-2612

IN RE GERARDO A. CRUZ,
Petitioner.

---

No. 04-2613

IN RE STATE ELECTIONS COMMISSION,
AURELIO GRACIA-MORALES, President of the
State Elections Commission,
Petitioners.

---

Before
Torruella, Circuit Judge,
Stahl, Senior Circuit Judge,
and Howard, Circuit Judge.

María Soledad Piñeiro, argued on behalf of respondents Manuel R. Suárez-Jiménez, Enid Abreu-Zurinaga, José A. Alvarez-Febles and Liany Fernández-Toledo.

Rafael Escalera-Rodríguez, argued on behalf of petitioners Gerardo A. Cruz and the State Elections Commission.

Richard H. Pildes, Professor of Law, New York University School of Law, with whom Pedro A. Delgado-Hernández, Ramón L. Walker-Merino, Eileen Marie García-Wirshing, and O'Neill & Borges, were on brief, for appellants The Puerto Rico Electoral Commission and Aurelio Gracia-Morales.

Charles J. Cooper, with whom Charles Fried, Brian S. Koukoutchos, Vincent J. Colatriano, Derek L. Shaffer, Nicole J. Moss, and Cooper & Kirk, PLLC, were on brief, for appellant Aníbal Acevedo-Vilá.

Theodore B. Olson, with whom Miguel A. Estrada, Andrew S. Tulumello, Matthew D. McGill, Gibson Dunn & Crutcher LLP, James F. Hibey, William R. Sherman, Howrey Simon Arnold & White, LLP, Joseph D. Steinfield, Prince, Lobel, Glovsky & Tye, LLP, Luis Berríos-Amadeo, Andrés W. López, The Law Offices of Andrés W. López, Andrés Guillemard-Noble, Nachman & Guillemard, Charles A. Rodríguez, and David C. Indiano, were on brief, for appellees.

Rafael Escalera-Rodríguez, Néstor J. Navas-D'Acosta, Reichard & Escalera, Zuleika Llovet-Zurinaga, Carlos E. López-López, and Llovet Zurinaga & López, PSC, were on brief, for appellant The Honorable Sila M. Calderón.

Pedro E. Ortiz-Álvarez, with whom Johanna Emmanuelli-Huertas, Jorge Martínez-Luciano, Gina Ismalia Gutiérrez-Galang, and the Law Offices of Pedro E. Ortiz-Álvarez, PSC, were on brief, for appellant Gerardo A. Cruz.

Luis Sánchez-Betances, with whom Gerardo De Jesús-Annoni, and Sánchez Betances & Sifre, P.S.C., were on brief, for appellant The Incoming Transition Committee.

**CORRECTED OPINION**

January 28, 2005

**TORRUELLA**, <u>Circuit Judge</u>; **STAHL**, <u>Senior Circuit Judge</u>; and **HOWARD**, <u>Circuit Judge</u>. The Commonwealth of Puerto Rico held general elections on November 2, 2004 for a variety of offices, including Governor and Resident Commissioner. Although over two million votes were cast, preliminary results indicate that the candidates from the Popular Democratic Party ("PDP") and the New Progressive Party ("NPP"), Aníbal Acevedo Vilá ("Acevedo") and Pedro Rosselló González ("Rosselló"), respectively, are separated by a very narrow margin -- a few thousand votes. This extremely close election has raised emotions in Puerto Rico and spawned the actions that are before us.

Plaintiffs-Appellees include NPP candidate Rosselló and a number of voters who voted for him in the November 2, 2004 election (collectively, "the Rosselló Plaintiffs").[1] Defendants-Appellants include PDP candidate Acevedo, the Puerto Rico Electoral Commission ("the Commission"), the president of the Commission, Aurelio Gracia Morales ("Gracia"), and its three Commissioners (collectively, "the Acevedo Defendants").[2] On November 10, 2004, the Rosselló Plaintiffs filed suit ("the Rosselló action") in the United States District Court for the District of Puerto Rico ("the

---

[1] Luis Fortuño, the NPP candidate for Resident Commissioner, is also a Plaintiff-Appellee.

[2] Sila M. Calderón-Serra, the incumbent Governor, and Acevedo's Incoming Government Transition Committee are likewise Defendants-Appellants.

District Court") in which they challenged, among other things, the validity of certain ballots that were cast in connection with the November 2, 2004 election. On November 24, 2004, the District Court issued an order that the Commission identify and set aside, but not consider, the contested ballots. The Acevedo Defendants seek review of that order.

Also part of this appeal is an action filed on November 16, 2004 in the Court of First Instance for San Juan, Puerto Rico, the local trial court, by four voters (collectively, "the Suárez Plaintiffs") who claim to have cast, and want to establish the validity of, the ballots at issue in the Rosselló action ("the Suárez action").[3] After the Court of First Instance dismissed the Suárez action on November 18, 2004 as moot, the Supreme Court of Puerto Rico ("Supreme Court") assumed jurisdiction over the case. Yet, before the Supreme Court took any meaningful action, the case was removed to the District Court. Motions were promptly filed to remand the action to the Supreme Court, and we have since been asked to exercise our power of mandamus and instruct the District Court to remand the action.

_____

[3] The following are the defendants in the Suárez action: (1) the Commission, (2) the President of the Commission, (3) the three Commissioners, (4) Rosselló, and (5) the NPP.

# I. BACKGROUND

## A. The November 2, 2004 Election

On November 2, 2004, general elections were held for the offices of Governor and Resident Commissioner.[4] The ballot that was to be cast in connection with those two offices ("the ballot") listed only the candidates for those two offices under the insignia of their respective political parties.[5] Puerto Rico's three major parties had candidates on the ballot for Governor: (1) Rosselló, from the NPP; (2) Acevedo, from the PDP; and (3) Rubén Berríos Martínez, from the Independence Party ("PIP"). The parties also had candidates on the ballot for Resident Commissioner.

The ballot instructed voters to vote for only one candidate for Governor and one for Resident Commissioner. On election day, voters filled in the ballots in the following ways: (1) by placing a mark under a party insignia, thereby voting for all of the candidates in that party's column ("a straight vote"); (2) by placing a mark next to the name of each desired candidate but not under a party insignia; (3) by placing a mark under a party insignia and next to a desired candidate of a party other than the one that had its insignia previously marked;[6] or (4) by placing a

---

[4] The Resident Commissioner is Puerto Rico's non-voting representative in Congress.

[5] The ballot is reproduced in Appendix A of this Opinion.

[6] The Commission has determined that such a ballot reflects a vote for the desired candidate and the remaining candidate under the

-5-

mark under a party insignia and marks next to two desired candidates associated with a party or parties other than the one that had its insignia previously marked ("a three-mark split vote").[7]

Prior to the November 2, 2004 election, the Commission, acting pursuant to its statutory authority, enacted regulations which outlined the procedures that were to be followed in adjudicating ballots, that is, in determining the validity of ballots and in awarding votes to the deserving candidates.[8] According to the procedures in place during the election in issue, each ballot was to be initially adjudicated, and each vote was to be tallied, at the polling location at which it was cast.[9]  If

---

party insignia.

[7]  As determined by the Commission, see infra, a three-mark split vote ballot reflects a vote for the two marked candidates, as well as a vote for the party.  A vote for a party on a three-mark ballot is credited to the party itself (and not to any of its candidates) for purposes of its reclassification as a "principal party," which entitles it to certain benefits, including the right to receive funding.  See 16 P.R. Laws Ann. §§ 3003, 3116.  A party is a principal party if, for example, it "obtained a number of votes under . . . its insignia on the ballot of Governor and Resident Commissioner[] of not less [than] seven (7) percent of the total number of votes cast for all the parties' insignias in the preceding general election."  § 3003(42) (second alteration in original).

[8]  See 16 P.R. Laws Ann. §§ 3007(k), 3013(l).

[9]  Each ballot was to be adjudicated by a group of three inspectors, consisting of one representative from each of the three principal parties.  If the inspectors were unable to agree, there were additional levels of review at each polling location.  The adjudicatory bodies at each level were comprised of one

those reviewing a ballot at a polling location were unable to unanimously agree on the adjudication of the ballot, it was to remain unadjudicated and be sent to the Commission, along with the results of the adjudicated ballots, for review. The Commission was then to engage in a "general canvass," during which the results of the adjudicated ballots were to be checked and the contested ballots were to be counted or rejected according to the judgment of the three Commissioners -- each of whom represented one of the three principal parties.[10] If they could not reach a unanimous consensus, the ballot was to be forwarded to the president of the Commission for a final determination.[11]

Over two million votes were cast in the November 2, 2004 gubernatorial election. Within seventy-two hours of the closing of the polls, the Commission issued a preliminary report that Acevedo was leading Rosselló by 3,880 votes. As a result of the closeness of the election, and in accordance with its regulations, the Commission, on November 4, 2004, ordered that a recount occur simultaneously with the general canvass. But, the next day, the

---

representative from each of the three principal parties.

[10] Although this is a somewhat simplified account of the general canvass procedures, the omitted details are irrelevant to this appeal.

[11] "Any party affected by a resolution, ruling or order of the [] Commission may, within the ten (10) days following the notice thereof, appeal to the Court of First Instance . . . ." 16 P.R. Laws Ann. § 3016a.

president of the Commission, Gracia, announced that the recount would not begin until the completion of the general canvass.

During the election, thousands of three-mark split vote ballots -- as many as 28,000 -- were cast. Apparently, the vast majority of these ballots contained a mark under the insignia of the PIP and marks next to the two PDP candidates.[12]

A number of the three-mark ballots were adjudicated at the polling centers on election night.[13] And, for the first two or three days of the general canvass, which began on November 8, 2004, some of the three-mark ballots that had been contested at the polling centers, and thus, had not been adjudicated, were determined to be valid. But, on November 11, 2004, a dispute arose when the NPP Commissioner took the position that the ballots in question were void. Because the PDP and PIP Commissioners disagreed, the issue was referred to Gracia. On November 12, 2004, Gracia decided that the ballots contained valid votes for both the marked candidates and the marked party, and later that day,

---

[12] It has been alleged that, on some of the three-mark split vote ballots: (1) the mark under the PIP insignia was made in pencil while the marks next to the PDP candidates were made in pen; and (2) the marks next to the PDP candidates were noticeably dissimilar from the mark made under the PIP insignia.

[13] There is, however, a dispute as to whether these ballots were adjudicated in a consistent fashion. It has been alleged that some of the ballots were declared void, some were adjudicated as containing valid straight votes for the PIP candidates, and some were adjudicated as containing valid split votes for the PDP candidates, as well as the PIP.

Gracia's decision was memorialized in a written resolution of the Commission.

### 1.  **The Federal and State Court Actions**

On November 10, 2004, the Rosselló Plaintiffs filed a complaint against the Acevedo Defendants in the District Court that asserted various federal constitutional claims under 42 U.S.C. § 1983 arising out of the November 2, 2004 election.  On November 12, 2004, an amended complaint was filed alleging that the Commission's decision to (1) regard the three-mark ballots as valid and count the votes contained therein, (2) suspend the recount pending completion of the general canvass,[14] and (3) disregard certain late-filed absentee ballots[15] violated a variety of their federal constitutional rights.[16]  The Rosselló Plaintiffs sought declaratory and injunctive relief in connection with the above

---

[14]  The Rosselló Plaintiffs, by their own concession, "have achieved complete and substantial relief" on this claim, and therefore, we need not give it any further consideration.

[15]  The Rosselló Plaintiffs have conceded, both in their opening brief and at oral argument, that they "have achieved complete and substantial relief" from the Commission with respect to this claim. To be sure, there is still a question as to whether the Commission will follow through with the relief it has promised.  But, any claim concerning this open question is not yet ripe.

[16]  In addition, the Rosselló Plaintiffs have alleged that the Commission violated their constitutional rights when it made "substantial changes" to the rules governing the election after the votes had been cast.

challenges.[17]    The District Court scheduled a hearing for November 18, 2004.[18]

Meanwhile, on November 16, 2004, the Suárez Plaintiffs, who claim to have cast three-mark ballots, filed suit in the Court of First Instance seeking, among other things, a declaratory judgment as to the validity of the three-mark ballots and an injunction requiring the Commission to adjudicate the ballots.[19] The Suárez Plaintiffs insisted that an invalidation of the ballots would deprive them of their right to vote and, thus, their "right to due process of law and to equal protection under the law."[20]

---

[17]  The Rosselló Plaintiffs also sought injunctive and declaratory relief in connection with their claim that Puerto Rico Law No. 197, 1 P.R. Laws Ann. §§ 456 et seq., "is unconstitutional to the extent that it purports to authorize or allow the transition process [for the next governor] to proceed before the next governor . . . has been determined."  We need not address this issue.  The District Court denied preliminary injunctive relief on this claim, and the Rosselló Plaintiffs did not bother to appeal that ruling. Moreover, whether Law No. 197 allows the transition process to go forward during a recount is a question of local law that will soon be mooted by the recount.

[18]  We note that the Rosselló Plaintiffs chose to challenge the decisions of the Commission in federal court rather than exercise their statutory right to appeal to the Court of First Instance. See 16 P.R. Laws Ann. § 3016a.

[19]  The Suárez Plaintiffs also sought declaratory and injunctive relief requiring the Commission to (1) complete the general canvass before conducting a recount and (2) certify the winning gubernatorial candidate by December 22, 2004.

[20]   The Suárez Plaintiffs filed this action even though the Commission had already decided that the three-mark ballots are valid.

The Court of First Instance dismissed the Suárez action without prejudice on November 18, 2004 on the ground that no actual controversy existed because the Commission had already upheld the validity of the ballots.[21] That same day, the Suárez Plaintiffs, concerned that the validity of the ballots had not been adequately established, requested that the Supreme Court of Puerto Rico review the Court of First Instance's dismissal. The Supreme Court agreed to do so. On the morning of November 20, 2004, the Commissioner of the NPP and the NPP itself, defendants in the Suárez action, removed the action to the District Court. Notice of removal was filed with the Supreme Court at 11:48 a.m. In response, the Suárez Plaintiffs and a defendant in the Suárez action, alleging various procedural defects in removal,[22] as well as lack of federal jurisdiction, moved the District Court to remand. Soon thereafter, two mandamus petitions were filed in this court, each one seeking an order requiring that the District Court remand the action.

Despite the removal, the Supreme Court purported to enter a judgment on the Suárez action on the evening of November 20, 2004. By a vote of four to three, it ordered that the three-mark ballots were to be adjudicated as containing valid votes for the

_____

[21] Significantly, the Commissioner of the NPP, a defendant in the Suárez action, had requested dismissal on several grounds, one of which was lack of jurisdiction because the Commission had already adjudicated the contested ballots as valid.

[22] Because of the disposition of the removal issue on other grounds, we need not address the alleged procedural defects.

-11-

marked candidates for Governor and Resident Commissioner, as well as the identified party for purposes of maintaining its principal party status.  See supra note 7.

On November 20, 2004, the District Court issued an order in the Rosselló action that the Commission "set aside and segregate" the three-mark ballots and refrain from announcing the winner of the gubernatorial election.  Then, on November 24, 2004, the District Court issued an order that:  (1) stated that the Supreme Court's judgment was void because the removal rendered the Supreme Court without jurisdiction to enter the judgment;[23] and (2) ordered that a recount be conducted by "counting the number of [three-mark] split ballots, identifying and segregating the same, but not adjudicating the ballots."  (Emphasis in original.)  The Acevedo Defendants appealed from the order that the three-vote ballots not be adjudicated.

## II.  THE PETITIONS FOR MANDAMUS

We begin with the two Emergency Petitions for Writ of Mandamus that request we exercise our power of mandamus and instruct the District Court to remand the Suárez action to the

---

[23]   We agree with the District Court that the Supreme Court's judgment was void.  The governing statute provides that the filing of "a copy of the notice [of removal] with the clerk of [the] State court . . . effect[s] the removal and the State court shall proceed no further unless and until the case is remanded."  28 U.S.C. § 1446(d) (emphasis added).  The Supreme Court received notice of the removal at 11:48 a.m. on November 20, 2004 but did not issue judgment until that evening.  The judgment is thus, as the District Court found, a nullity.

-12-

Puerto Rico courts. These mandamus petitions contest the validity of removal on two principal grounds: (1) the absence of federal question jurisdiction over the Suárez action, and (2) the failure of the removing parties to obtain the consent of all Suárez action defendants (including Petitioners) to removal. Since both petitions are substantially the same, they will be discussed as one.

We note at the outset that we have given the District Court ample opportunity to decide whether removal of the Suárez action was proper, and despite the time-sensitive nature of this case, and three weeks of hearings on the merits of the Rosselló action which has been consolidated with this case for appeal, we are now faced with the extreme decision of whether we should compel remand through a Writ of Mandamus.

In order to stave off the need for mandamus, we invited the District Court to address these mandamus petitions. In response, the court appended a footnote to the opinion of November 30, 2004 in which the District Court asserted jurisdiction over the parallel federal case. Pedro Rosselló, et al. v. Sila M. Calderón, et al., No. 04-2251, slip op. at 3, n.2 (D.P.R. Nov. 30, 2004). The footnote indicated that a hearing was needed to properly evaluate the jurisdictional issues raised in the pending motions to remand. Specifically, the District Court indicated: (1) that the Suárez Plaintiffs' complaint had alleged violations of

due process and equal protection without specifying whether the source of these protections was the Commonwealth or Federal Constitution; (2) that federal jurisdiction might be required under Franchise Tax Board v. Construction Laborers Vacation Trust, 463 U.S. 1, 22 (1983); and finally, (3) that the legal interests of some Suárez Defendants might require their realignment with the plaintiffs in that action.

Following a hearing on December 8, 2004, the District Court issued an opinion resolving various challenges to the removal jurisdiction. Manuel R. Suárez, et al. v. Comisión Estatal de Elecciones, et al., No. 04-2288, slip op. (D.P.R. Dec. 10, 2004)(hereinafter "Remand Opinion"). In that opinion, the District Court held that "examining the evidence in the light most favorable to the defendants . . . an overvote issue may exist[] in violation of Due Process and Equal Protection principles under the case of Bonas v. Town of North Smithfield, 265 F.3d 69 (1st Cir. 2001)." Remand Opinion at 12-13; see also Bonas, 265 F.3d at 73-74.[24] Although it evaluated and rejected the majority of the arguments against removal before it, the District Court still has not made a final decision on the ultimate question of whether to remand the case to the Puerto Rico courts. Nevertheless, the District Court determined in its December 10 opinion that a federal question had

_____

[24]  We address the applicability of Bonas below in our discussion of the Rosselló action.

-14-

been presented in the Suárez complaint. That determination was plainly erroneous, and our resolution of the Rosselló action today is decisive of the motion to remand. Because the District Court plainly erred, and because every additional day spent adjudicating this issue before the District Court or on appeal before this court increases the risk of irreparable harm, our intervention by Writ of Mandamus would be appropriate.

## A. **Availability of Mandamus**

Although it is an extraordinary remedy, mandamus can be appropriate in those rare cases in which the issuance (or non-issuance) of an order (1) raises a question about the limits of judicial power, (2) poses a risk of irreparable harm to the appellant, and (3) is plainly erroneous. See Christopher v. Stanley-Bostich, Inc., 240 F.3d 95, 99 (1st Cir. 2001). Moreover, "the case for mandamus is particularly compelling where the order poses an elemental question of judicial authority." Id. at 99-100. The instant petitions clearly meet the first requirement, as they concern the boundaries of the District Court's power to remove cases from Commonwealth courts. See, e.g., Hernández-Agosto v. Romero-Barceló, 748 F.2d 1, 4-5 (1st Cir. 1984) (issuing mandamus to remand improperly removed action to Puerto Rico court). Second, the risk of irreparable harm from the continued pendency of removal jurisdiction is acute: there are now fewer than three weeks remaining before inauguration day on January 2, 2005. Third, as

-15-

elucidated below, we find that the District Court's failure to remand is plainly erroneous because the Suárez Plaintiffs presented no claim of right arising under federal law.  See 28 U.S.C. § 1441.

## B.  **Validity of Removal**

We find that the exercise of removal jurisdiction is plainly erroneous in this case because no federal question was presented in the Suárez action either procedurally (because the four corners of the complaint do not plead a federal question) or substantively (because we have decided in the Rosselló action that the federal courts will not intervene in a local electoral dispute).  Because we find that remand to the Puerto Rico Supreme Court is necessary due to the absence of a federal question, we do not address the petitioners' second argument, that removal was improper because it did not receive the consent of all defendants to the Suárez action.

### 1.  **Well-Pleaded Complaint Rule**

A case may be removed to federal court if it presents a "claim or right arising under the Constitution, treaties or laws of the United States."  28 U.S.C. § 1441(b).  "The Supreme Court of the United States has made clear that, in deciding (for removal purposes) whether a case presents a federal 'claim or right,' a court is to ask whether the plaintiff's claim to relief rests upon a federal right, and the court is to look only to plaintiff's complaint to find the answer."  Hernández-Agosto v. Romero-Barceló,

-16-

748 F.2d 1, 2 (1st Cir. 1984) (emphasis in original).  The existence of a federal defense is not sufficient for removal jurisdiction.  Franchise Tax Bd., 463 U.S. at 10-11.  Thus, we must turn to the Suárez complaint to ascertain whether, within its four corners, a federal "claim or right" has been presented.  Our evaluation centers on the complaint's allegations of violations of "due process" and "equal protection."[25]  These claims do not explicitly state whether the source of these constitutional protections is the Commonwealth or the Federal Constitution.[26]

---

[25]  Respondents also note that the Suárez complaint attached and made reference to the complaint filed four days earlier in federal court by Rosselló.  No federal claim can be inferred from this reference to the federal action; rather, it was included in the Suárez complaint as factual background.  See Suárez complaint at para. 8.  Further, even assuming it is proper for us to look outside the four corners of the Suárez complaint to the previously-filed federal action, as we discuss below, the Rosselló complaint does not state a claim warranting federal intervention into this local electoral dispute, and therefore cannot be considered sufficiently substantial to give rise to removal jurisdiction under Franchise Tax Board.  See Almond v. Capital Props., Inc., 212 F.3d 20, 23 (1st Cir. 2003).

[26]  We are aware of only one other case dealing with federal removal jurisdiction over a claim filed in state court with ambiguous references to constitutional provisions.  In Dardeau v. West Orange-Grove Consolidated I.S.D., 43 F. Supp. 2d 722 (E.D. Tex. 1999), a federal district court evaluated a situation very much like the one we face here.  In Dardeau, a complaint was filed in state court that made explicit reference only to state law, but also claimed a violation of "due process."  Ambiguity with regard to the source of this right was heightened relative to our case because, while those words appear in the United States Constitution, the Texas Constitution uses the phrase "due course of law."  Id. at 732.  For reasons substantially similar to those we set out below, the district court nevertheless interpreted the complaint narrowly to find no federal cause of action to sustain removal jurisdiction.  Id. at 730-34.

-17-

Read as a whole, we cannot say that this complaint presents a claim under the Federal Constitution. No explicit reference to the United States Constitution or any other federal law is contained in the complaint; instead, all references are to Puerto Rico state laws, regulations, and the Commonwealth Constitution. Specifically, paragraph 11 of the complaint bases the Suárez Plaintiffs' claims in the right to vote guaranteed in Article II, Section 2, of the Commonwealth Constitution. The complaint's subsequent references to the plaintiffs' rights to vote and to have their votes counted in accordance with equal protection and due process, while not expressly premised on the Puerto Rico Constitution, logically refer back to the antecedent citation to Article II, Section 2 of the Commonwealth Constitution.

Moreover, it is well-settled that "the plaintiff [is] the master of the claim; he or she may avoid federal jurisdiction by exclusive reliance on state law." Caterpillar Inc. v. Williams, 482 U.S. 386, 392 (1987). Thus, the burden to prove that a federal question has been pled lies with the party seeking removal. BIW Deceived v. Local S6, Indus. Union of Marine & Shipbuilding Workers, 132 F.3d 824, 831 (1st Cir. 1997). In light of this burden, and of the important federalism concerns at play in considering removal jurisdiction, see, e.g., Franchise Tax Bd., 463 U.S. at 8, we find that any ambiguity as to the source of law relied upon by the Suárez plaintiffs ought to be resolved against

-18-

removal. See Shamrock Oil & Gas Corp. v. Sheets, 313 U.S. 100, 108-09 (1941) (removal statute should be strictly construed against removal).

### 2. **Artful Pleading Doctrine**

The Respondents invite this court to consider the possibility that the Suárez Plaintiffs engaged in artful pleading, a "corollary of the well-pleaded complaint rule that a plaintiff may not defeat removal by omitting to plead necessary federal questions in a complaint." Franchise Tax Bd., 463 U.S. at 22. As discussed below with regard to federal ingredient jurisdiction, no federal question is necessary to the resolution of the state claims raised in the Suárez complaint. Furthermore, we are skeptical of the applicability of the artful pleading doctrine outside of complete federal preemption of a state cause of action. See, e.g., id. at 23 (stating that the "necessary ground" for the creation of the artful pleading doctrine "was that the preemptive force of [a federal statute was] so powerful as to displace entirely any state cause of action"); Rivet v. Regions Bank, 522 U.S. 470, 475-76 (1998) ("The artful pleading doctrine allows removal where federal law completely preempts a plaintiff's state-law claim."). And surely, the United States Constitution cannot be said to wholly preempt the Commonwealth's grant of similar rights under its own Constitution. See PruneYard Shopping Ctr. v. Robins, 447 U.S. 74, 81 (1980) (state constitution may afford more, but not less,

-19-

protection than Federal Constitution); see also Nieves v. Univ. of Puerto Rico, 7 F.3d 270, 275 (1st Cir. 1993) (noting that "'poverty' is considered a suspect classification under the Commonwealth constitution, triggering 'strict scrutiny' analysis unobtainable under the Equal Protection Clause of the United States Constitution"). Thus, the artful pleading doctrine has no application to this dispute.

### 3. **Federal Ingredient**

Respondents also argue that even in the absence of a claim arising under federal law on the face of plaintiffs' well-pleaded complaint, federal removal jurisdiction is still proper under the Supreme Court's statement in Franchise Tax Board that removal would be appropriate "if a well-pleaded complaint established that [the plaintiff's] right to relief under state law requires resolution of a substantial question of federal law." 463 U.S. at 13. Under this "federal ingredient" doctrine, a case arises under federal law for purposes of removal when "the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." Id. at 27-28.

Federal ingredient jurisdiction remains "controversial," Almond, 212 F.3d at 23, because

> [t]he Supreme Court has periodically affirmed
> this basis for jurisdiction in the abstract
> . . ., occasionally cast doubt upon it, rarely
> applied it in practice, and left the very
> scope of the concept unclear. Perhaps the
> best one can say is that this basis endures in

-20-

                    principle but should be applied with caution
                    and various qualifications.

Id. (internal citations and footnote omitted); see also Metheny v.

Becker, 352 F.3d 458, 460 (1st Cir. 2003) (noting that federal

ingredient doctrine "remains vibrant in this circuit but 'should be

applied with caution'" (quoting Almond, 212 F.3d at 23)).  With

this caution in mind, we turn to the respondents' argument.

        Respondents  hang  their  jurisdictional  hat  on  two

doctrines that they allege exist in the caselaw of the Puerto Rico

Supreme Court.  The first stems from the Puerto Rico Supreme

Court's  statements  in  a  1964  case  that,  in  accepting  the

Commonwealth's Bill of Rights, the United States Congress "was to

presume -- and in fact it is so and ought to be -- that the public

powers and the courts of the Commonwealth shall render effective

and construe the provisions of the [Puerto Rico] Bill of Rights in

a manner consistent with the protection afforded . . . by the same

or similar provisions of the Constitution of the United States."

R.C.A. Communications, Inc. v. Gov't of the Capital, 91 P.R.R. 404,

414-15 (P.R. 1964).  The second comes into play when a federal

court certifies a question of state law to the Puerto Rico Supreme

Court.  According to the Supreme Court:

                [W]hen the question before us refers to the
                validity of a state law under a clause of the
                state constitution that is similar to a clause
                in the federal Constitution . . . the issue is
                a mixed question of federal and state rights
                that must be resolved by the federal court,
                because the validity of the statute under the

                              -21-

> federal Constitution necessarily disposes of the question under state law. . . . In these circumstances we must refuse certification, since our decision would be only advisory.

Pan Am. Computer Corp. v. Data Gen. Corp., 112 D.P.R. 780, 793-94 (1982) (translation supplied by this court). According to Respondents, these two provisions mean that the Supreme Court's evaluation of the Suárez Plaintiffs' claims under the due process and equal protection doctrines of the Commonwealth Constitution will require the resolution of a federal question: whether the parallel provisions of the United States Constitution would be violated by the acts in question. Accordingly, Respondents argue, the District Court has removal jurisdiction under the federal ingredient doctrine.

These arguments fundamentally misconstrue the federal ingredient doctrine. Whether a state court will adopt as the meaning of the state's constitution the federal courts' interpretation of parallel language in the United States Constitution is a matter of state law. See, e.g., Nieves, 7 F.3d at 274. Federal law does not compel such an outcome. Thus, a determination of whether a violation of the Puerto Rican Constitution's guarantees of due process and equal protection has occurred does not "require resolution" of whether the conduct complained of would violate the Federal Constitution. Franchise Tax Bd., 463 U.S. at 13 (emphasis added); see also Gully v. First Nat'l Bank, 299 U.S. 109, 112-13 (1936) ("To bring a case within

-22-

the [removal] statute, a right or immunity created by the Constitution . . . must be an element, <u>and an essential one</u>, of the plaintiff's cause of action.") (emphasis added). To decide otherwise would mean that <u>any</u> case brought under a provision of the Puerto Rico Constitution that mirrors the language of the United States Constitution could be removed into federal court. Accordingly, we find that removal jurisdiction over the Suárez action is lacking, and it must be remanded to the Commonwealth court from which it was removed. 28 U.S.C. § 1447.

### 4. **Effect of the Rosselló Decision**

Lastly, and perhaps most significantly, the Suárez complaint cannot be said to state a federal question, because, as we will discuss now, the federal courts will not intervene in a local electoral dispute such as this. Although we find that it was plain error for the District Court not to remand the Suárez action back to the Puerto Rico courts on the basis of the well-pleaded complaint rule, and therefore we could issue a Writ of Mandamus compelling remand, we realize that the District Court now has the benefit of both our above discussion and our decision in the Rosselló action. Therefore, we are confident that the District Court will immediately remand the Suárez action back to the Supreme Court of Puerto Rico without the need for mandamus.

### III. APPEAL OF THE NON-ADJUDICATION ORDER

We now turn to the appeal of the non-adjudication order that is before us in connection with the Rosselló action. We have repeatedly held that federal courts "normally may not . . . undertake the resolution of 'garden variety election irregularities.'" <u>Bonas</u>, 265 F.3d at 74 (quoting <u>Griffin</u> v. <u>Burns</u>, 570 F.2d 1065, 1076 (1st Cir. 1978)). We have departed from this general rule of non-intervention on only two occasions. <u>See</u> <u>Bonas</u>, 265 F.3d at 75-76; <u>Griffin</u>, 570 F.2d at 1079. As we elucidate below, those two cases are easily distinguished from the case at hand. Here, Circuit precedent demands application of the general principle of non-intervention, and therefore, we vacate the issuance of the preliminary injunction and direct the District Court to dismiss the case.

### A. **Nature of Our Review**

The Acevedo Defendants are presently before us seeking review of the District Court's issuance of a preliminary injunction to segregate, but not adjudicate, all three-mark split vote ballots cast during the November 2, 2004 election. It appears from the language in the order implementing the injunction that the District Court issued the injunction merely to preserve its jurisdiction, and therefore we will treat it as such.[27]

---

[27] Although we are skeptical that the only purpose or effect of the injunction was to preserve jurisdiction, especially considering the fact that this "jurisdiction-preserving" injunction is still in

-24-

**B.  <u>Temporary Injunctions to Preserve Jurisdiction</u>**

Congress has provided "[t]he Supreme Court and all courts established by Act of Congress [with the authority to] issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a).  Acting pursuant to § 1651(a), a federal court may issue an injunction as a means to preserve its jurisdiction. <u>See, e.g.</u>, <u>Klay</u> v. <u>United Healthgroup, Inc.</u>, 376 F.3d 1092, 1099 (11th Cir. 2004).  But, for a court to invoke § 1651(a) and issue an injunction to protect its jurisdiction over an action, there must be at least the possibility that the complaint states a justiciable federal claim.  Thus, implicit in our review of the issuance of the injunction is our review of whether the Rosselló complaint, taking all claims alleged therein as proven, had the potential to present a justiciable federal claim under existing Circuit precedent.  <u>Mercury Motor Express, Inc.</u> v. <u>Brinke</u>, 475 F.2d

---

place after approximately three weeks worth of "marathon hearings" on the merits, we find that our skepticism is irrelevant in light of the manner in which we resolve the case.  Furthermore, although we believe that we properly review the non-adjudication order as an appealable interlocutory injunction pursuant to 28 U.S.C. § 1292(a)(1), we note that even if we were incorrect in this conclusion, we would, in the alternative, exercise our discretion to treat the Acevedo Defendants' notice of appeal as a petition for mandamus under the All Writs Act, 28 U.S.C. § 1651(a), thus preserving our jurisdiction in any event.  <u>See, e.g.</u>, <u>United States</u> v. <u>Horn</u>, 29 F.3d 754, 769 (1st Cir. 1994) ("We are fortified in our resolve to hear and determine this appeal by the knowledge that, even if no appeal lies as of right, we possess--and can appropriately exercise--the power of discretionary review via mandamus, to address the important question raised in this case.").

1086, 1091 (5th Cir. 1973) ("Once a case is lawfully before a court of appeals, it does not lack power to do what plainly ought to be done. . . . [It has] the power . . . to reach the merits of a case before it on an interlocutory appeal and [to] dismiss the action.") (internal quotation marks, alterations, and citations omitted); see also Aerojet-Gen. Corp. v. Am. Arbitration Ass'n, 478 F.2d 248, 252 (9th Cir. 1973) ("[I]t is well established that in [an equity] case, . . . an interlocutory appeal brings the entire case before the court.").

Our review is for abuse of discretion. Klay, 376 F.3d at 1096.

## C. Federal Jurisdiction Over § 1983 Complaints

Having determined that we must inquire whether the District Court should have intervened in this local election dispute based on the claims alleged in the complaint, our first step necessarily begins at the broadest level –- that is, whether the District Court had federal subject matter jurisdiction over the action. See Bonas, 265 F.3d at 73. "Federal courts are courts of limited jurisdiction, and therefore must be certain that they have explicit authority to decide a case." Id. (citing Irving v. United States, 162 F.3d 154, 160 (1st Cir. 1998) (en banc)). "Thus, we subject the plaintiffs' choice of a federal forum to careful scrutiny." Id.

-26-

In Griffin, we set forth the analytical framework to evaluate whether a federal court could exercise jurisdiction over a local electoral dispute. See 570 F.2d at 1070; see also Bonas, 265 F.3d at 73. As this case is brought pursuant to 42 U.S.C. § 1983, we turn to the language of the jurisdictional counterpart of that statute, 28 U.S.C. § 1343(3), which mirrors § 1983, and provides that "district courts shall have original jurisdiction of any civil action . . . [t]o redress the deprivation, under color of State law, statute, . . . custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens . . . ." 28 U.S.C. § 1343(3). Thus, federal jurisdiction hinges on whether plaintiffs have a colorable claim under § 1983.[28] See Griffin, 570 F.2d at 1070; see also Bonas, 265 F.3d at 73-74 ("In other words, federal courts have jurisdiction over claims arising out of a state or local electoral dispute if, and to the extent that, the complaint limns a set of facts that bespeaks the violation of a constitutionally guaranteed right.").

There is no doubt that the Rosselló complaint alleges the violation of a constitutionally guaranteed right, and thus, presents a colorable claim under § 1983 for subject-matter-

[28] The standard for determining the existence of original federal jurisdiction under 28 U.S.C. § 1343 is, of course, much more liberal than the standard for determining the existence of removal jurisdiction under 28 U.S.C. § 1441, at least outside of the complete preemption context. See BIW Deceived, 824 F.2d at 832.

jurisdiction purposes. The Federal Constitution protects the right of all qualified citizens to vote in local elections. See Bonas, 265 F.3d at 74. This conclusion, however, does not end our inquiry. Having determined that the District Court could have exercised jurisdiction in this case, we must now inquire whether it should have intervened. See Griffin, 570 F.2d at 170.

As mentioned above, and discussed more extensively below, "[e]lection law, as it pertains to state and local elections, is for the most part a preserve that lies within the exclusive competence of the [local] courts." Bonas, 265 F.3d at 74. We have thus stated that "with only a few narrow and well-defined exceptions, federal courts are not authorized to meddle in local elections." Id. This general rule of non-intervention dictates that the District Court should not have intervened in this case.

## D. **District Court's Decision to Intervene**

As discussed above, we review the decision of the District Court to intervene in this local election dispute for abuse of discretion. Klay, 376 F.3d at 1096. In evaluating whether federal intervention into a local election dispute is appropriate, this Court has inquired into factors such as whether a discrete group of voters has been disenfranchised, whether there was a state process in place to handle the question posed by the plaintiffs, and whether the plaintiffs had availed themselves of that state process. See Griffin, 570 F.2d at 1078-79; Bonas, 265

-28-

F.3d at 75-76; see also Partido Nuevo Progresista v. Barreto Pérez, 639 F.2d 825, 828 (1st Cir. 1980). As we stated in Bonas, however, "[w]e do not pretend that it is a simple matter to segregate the run-of-the-mill electoral disputes from those that appropriately can be characterized as harbingers of patent and fundamental fairness." 265 F.3d at 75. Indeed, "each case must be evaluated on its own facts." Id. But, as this Court implied in Barreto Pérez, there is a heavy presumption in favor of non-intervention if the party requesting intervention cannot show that a discrete group of voters has been disenfranchised by the challenged local action. See 639 F.2d at 828.

Here, the final decision under Puerto Rico law to adjudicate all three-mark ballots under one consistent standard does not disenfranchise any Puerto Rico voters -- indeed, it is the position espoused by the Rosselló Plaintiffs that stands to disenfranchise an estimated 28,000 voters. Thus, because the Rosselló Plaintiffs cannot claim that federal intervention is necessary because a discrete group of voters has been disenfranchised, and because they cannot allege any other harm sufficient to overcome the general rule of non-intervention,[29] we

---

[29] We do not foreclose the possibility of a case in which federal intervention would be appropriate without a showing of disenfranchisement. The most obvious example of this would be a case involving vote dilution. See Bush v. Gore, 531 U.S. 98, 105 (2000) (per curiam) ("It must be remembered that 'the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the

conclude that it was an abuse of discretion for the District Court to intervene in this local election dispute.

In Griffin v. Burns, this Court determined that federal intervention into a state election was appropriate where a significant percentage of the qualified and voting electorate was, in effect, denied its vote. See 570 F.2d at 1078-79. In that case, although it was undisputed that Rhode Island had issued and counted absentee and shut-in ballots in prior primaries, and that voters utilizing such ballots had relied on that prior practice and on instructions from state officials in so doing, the Rhode Island Supreme Court said the Rhode Island Secretary of State was without the authority to issue and count absentee and shut-in ballots in a primary election, effectively disenfranchising all absentee and shut-in voters that had already voted. Id. at 1075-76.

---

free exercise of the franchise.'") (quoting Reynolds v. Sims, 377 U.S. 533, 555 (1964)).

Here, however, the Rosselló Plaintiffs' claim that the Commission's "change in the rules" after the election somehow "diluted" their vote for their political party of choice is without merit because there was no clear rule prior to the election that the three-mark split ballots were invalid.

The Rosselló Plaintiffs' claim that the three-mark split ballots were adjudicated inconsistently on election night (and immediately thereafter), on the other hand, presents a much stronger claim for federal intervention without a showing of disenfranchisement. That claim, however is rendered moot by the fact that all ballots will be adjudicated in the same uniform manner during the recount. See Bush v. Gore, 531 U.S. at 106 (per curiam) (addressing situation where "the standards for accepting or rejecting contested ballots might vary not only from county to county but indeed within a single county from one recount team to another.").

-30-

In _Bonas_, this Court held that complete disenfranchisement of all voters, by a municipality's decision not to hold a municipal election at all, warranted federal intervention. _See_ 265 F.3d at 75-76. In that case, after the voters of North Smithfield, Rhode Island agreed in a 1998 referendum to transition the Town from an odd-year election cycle to an even-year cycle, with the first even-year election to take place in 2002, town officials, without authorization, held the 1999 election, but held no election in either 2000 or 2001, effectively disenfranchising all persons eligible to vote in the 2001 municipal election. _Id._ at 71-72.

In _Barreto Pérez_, however, this Court determined that federal intervention was inappropriate in a case challenging the decision of the Supreme Court of Puerto Rico where "[the] case [did] not involve a state court order that dis enfranchise[d] voters; rather it involve[d] a Commonwealth decision that en franchise[d] them." 639 F.2d at 828. That case is remarkably similar to the case at hand. In that case, the disputed ballots contained marks outside the designated spaces and squares, and therefore were allegedly invalid under the literal terms of Article 1.033(b) of the Electoral Law of Puerto Rico, which provided that stray marks such as the ones on the disputed ballots "shall be null and void, and deemed unmarked." _See id._ at 826. The Administrator of the Election Commission ruled the ballots invalid, and his

-31-

decision was upheld on appeal by the Electoral Review Board. See id. The Supreme Court of Puerto Rico reversed, finding that despite 16 L.P.R.A. § 3033(b)'s literal prohibition of counting such mismarked ballots, the provision could be construed as permitting the tallying of such ballots where the "intent of the voter was clear." See id. (discussing Puerto Rico Supreme Court decision). The PNP subsequently brought suit in federal court pursuant to § 1983, alleging that the Supreme Court of Puerto Rico's "retroactive" changing of the law after an election violated the plaintiffs' rights not to be deprived of their liberty and First Amendment rights without procedural and substantive due process of law. Id. at 827. The district court agreed, stating that "[i]n our opinion the lesson to be learned from Griffin is[] that changing the rules of the game after it has been played and the score is known, violates fundamental rules of fair play." Partido Nuevo Progresista v. Gerineldo Barreto-Pérez, 507 F. Supp. 1164, 1174 (D. P.R. 1980). It found that the "counting of ballots after an election which, under the rules prevalent at the time of the vote-casting were considered void and invalid, [was] the practical and functional equivalent of alteration of ballots or of stuffing the ballot box." Id. On appeal, this court disagreed. See Barreto Pérez, 639 F.2d at 828.

We emphasized that unlike in Griffin, where the disputed local action involved the disenfranchisement of a discrete group of

-32-

voters, the local action at issue in Barreto Pérez actually enfranchised voters. See id. Instead of disenfranchisement, the plaintiffs in Barreto Pérez claimed that "votes were 'diluted' by the votes of others, not that they themselves were prevented from voting." Id. Moreover, the case was also unlike Griffin in that "had those casting absentee ballots known of their possible invalidity, many might have gone to the polls and voted in person." Id. In Barreto Pérez, however, "there was no such reliance upon an official interpretation of the local election law; no party or person is likely to have acted to their detriment by relying upon the invalidity of ballots with marks outside the ballots' drawn rectangles." Id. The court concluded that the case did not fall "within the purview of Griffin but within the area delineated by the Second Circuit, in Powell v. Power, 436 F.2d 84 (1970), as inappropriate for federal court review in a civil rights action, lest the federal court 'be thrust into the details of virtually every election.' Id. at 86." Id.

The case presented by the Rosselló Plaintiffs, even assuming that all claims alleged in their complaint could be proven, presents even less cause for federal intervention than the circumstances which we found lacking in Barreto Pérez. Here, there is no clearly articulated Commonwealth policy, much less a statute, to indicate the three-mark split vote ballots were invalid. At most, the decision of the Commission merely clarified

-33-

previously unsettled law. Furthermore, this case is distinguishable from <u>Griffin</u> and <u>Bonas</u>, because "this case does not involve a state court order that dis enfranchise[d] voters; rather it involves a Commonwealth decision that en franchises them." <u>Barreto Pérez</u>, 639 F.2d at 828. Therefore, it was an abuse of discretion for the District Court to determine that the Rosselló Plaintiffs' complaint could possibly state a claim with grounds for federal intervention, and as a result, it was necessarily an abuse of discretion for the District Court to grant a preliminary injunction preserving jurisdiction in a case in which our Circuit precedent clearly required the District Court not to intervene.

## IV. <u>CONCLUSION</u>

For the above reasons:

The Petitions for Writ of Mandamus are **<u>DENIED</u>**, as the District Court has no choice but to remand the Suárez action to the Supreme Court of Puerto Rico in light our disposition of the Rosselló appeal.

We **<u>VACATE</u>** the issuance of the preliminary injunction with the direction that the District Court dismiss with prejudice all claims in the Rosselló complaint relating to the adjudication of the three-mark ballots, and all claims relating to the simultaneous general canvass/recount issue. The District Court is also directed to dismiss without prejudice the claims relating to

the absentee ballots, and any alleged violations of Puerto Rico Law 197.

Because the supplemental materials proffered by the appellants are unnecessary to our decision, the motions to supplement the record on appeal are **DENIED AS MOOT**. We likewise **DENY** the appellees' request for judicial notice.

Leave to file an amicus brief is **GRANTED** to the Puerto Rico Association of Mayors, the Puerto Rico Commonwealth Employee Association and the Board of Directors of Cumbre Social, the Colegio de Abogados de Puerto Rico (oversized brief), Efraím Cintrón García, and Gerardo Ramírez. We acknowledge the assistance of amici.

Any petition for rehearing or rehearing en banc must be filed no later than 12 noon Eastern Standard Time on Tuesday, December 21, 2004. See Fed. R. App. P. 40(a)(1).

**"Concurrence to follow"**

**TORRUELLA, <u>Circuit Judge</u> (in additional concurrence).**

Although I shared equally with my colleagues in analyzing the law and determining the outcome of these cases, I find it appropriate to set forth some additional observations in light of the circumstances surrounding these appeals.

Although, as expressed in our panel opinion, our circuit precedents in <u>Griffin</u>, <u>Barreto Pérez</u>, and <u>Bonas</u> finally decide the issue that the district court should not have intervened in this case, I wish to point out that this conclusion is based on the particular facts of this case, which makes <u>Bush</u> v. <u>Gore</u>, 531 U.S. 98 (2000), inapplicable. The present circumstances do not support a justiciable federal vote-dilution claim by voters who cast ballots that were clearly valid under rules changed after the election. <u>See</u> <u>Bush</u>, 531 U.S. at 106-107 (criticizing as inconsistent with equal protection Miami-Dade County's alteration, during recount, between 1990 rules for ballot validity and new, <u>ad hoc</u> rules). What happened here was not a <u>change</u> in Puerto Rico's established rules with regard to three-mark split vote ballots, but rather a <u>clarification</u> of the status of the ballots, whose validity or invalidity had not before been clearly established as a matter of Puerto Rico election policy.

More important in my opinion, the preeminent truth to be gleaned from the <u>Bush</u> opinion is that the United States is, first and foremost, a nation of laws and that the meaning of these laws

-36-

is interpreted by the courts, whose rulings become the Law of the Land. Thus, notwithstanding the unprecedented nature of the <u>Bush</u> v. <u>Gore</u> decision, issued in the face of a very divided nation, its binding finality was accepted by the citizenry as a whole, irrespective of individual or collective disagreement with its outcome. Although undoubtedly there was much dissonance, as there may well presently be in Puerto Rico, the nation turned a figurative page and acquiesced. This response reflected our nation's longstanding recognition that:

> [c]ompliance with decisions of [the judiciary], as the constitutional organ [interpreting] the supreme Law of the Land, has often, throughout our history, depended on active support by state and local authorities. It presupposes such support.

<u>Cooper</u> v. <u>Aaron</u>, 358 U.S. 1, 26 (1958) (Frankfurter, J., concurring).

Indeed, the basic principle articulated by Justice Frankfurter in <u>Cooper</u> is so foundational to our political system that it is literally set in stone on the very walls of this federal courthouse: "[T]he responsibility of those who exercise power in a democratic government is not to reflect inflamed public feeling but to help form its understanding . . . ." <u>Id.</u> I urge the People of Puerto Rico, and the parties in these appeals, to remember these words as they stand at this important crossroads in our shared history as a society joined by our respect for democratic values,

-37-

underpinned by the rule of law. For, as Justice Frankfurter so ably stated:

> [F]rom their own experience and their deep reading in history, the Founders knew that Law alone saves a society from being rent by internecine strife or ruled by mere brute power however disguised . . . . The duty to abstain from resistance to "the supreme Law of the Land" . . . as declared by the organ of our Government for ascertaining it, does not require immediate approval of it nor does it deny the right of dissent. Criticism need not be stilled. [However] active obstruction or defiance is barred . . . .

Id. at 23-25.

As important as the outcome of this election may presently be, there are more fundamental issues at stake.

**"Concurrence to follow."**

**HOWARD, <u>Circuit Judge</u> (in additional concurrence).**

I have joined in the court's disposition of these cases. I am less sure about our resolution of certain, discrete issues raised by the <u>Rosselló</u> appeal, and I identify those concerns here.

1.  The district court did not categorize the order preventing the Commission from adjudicating the ballots. <u>See</u> Fed. R. Civ. P. 65(d); <u>Ben David</u> v. <u>Travisono</u>, 495 F.2d 562, 563 (1st Cir. 1974). As I see it, the order might plausibly be characterized as an All Writs Act Injunction, a traditional injunction under Fed. R. Civ. P. 65, or a case management order. Under the first two possibilities, we have appellate jurisdiction under 28 U.S.C. § 1292(a)(1); under the third we do not. <u>See</u> <u>Matter of City of Springfield</u>, 818 F.2d 565, 567-68 (7th Cir. 1987).

In the end, we need not decide this issue. Even if the order is properly characterized as only a case management directive, we are entitled to review it under our mandamus power. <u>See</u> <u>Ramírez</u> v. <u>Rivera-Dueño</u>, 861 F.2d 328, 334 (1st Cir. 1988). In my view, we should do so, given the jurisdictional issue at the heart of this case, the coercive and intrusive nature of the order, the federalism and comity concerns that it raises, and the highly charged circumstances in which it was issued. And because the question of the order's propriety cannot be decided without an analysis of whether the <u>Rosselló</u> action is justiciable, I concur in

-39-

the decision to proceed directly to the merits and to order the action dismissed.

2. Notwithstanding our statement that the district court has federal question jurisdiction over the case, we have concluded that the district court abused its discretion by asserting jurisdiction over it. I would rather we characterize the matter somewhat differently. There is no question, of course, that the district court has subject matter jurisdiction of a federal civil rights claim pleaded under 42 U.S.C. § 1983. The issue is whether the pleaded federal claim is justiciable. This question is not a matter of discretion; it is an issue of law. See Bonas v. Town of N. Smithfield, 265 F.3d 69, 73-75 (1st Cir. 2001). And it is an issue of law that implicates the court's "jurisdiction" only in the sense that justiciability is regarded as a jurisdictional doctrine. See id.

3. Finally, citing Partido Nuevo Progresista v. Barreto Pérez, 639 F.2d 825, 827-28 (1st Cir. 1980), we have emphasized that the "change of rules" claim fails because, even if there was such a change, it would result in enfranchising some voters rather than disenfranchising them. But after Bush v. Gore, 531 U.S. 98 (2000), I cannot discount the possibility that a viable federal vote-dilution claim might lie in some circumstances where a post-election rule change has the effect of causing previously invalid ballots to be adjudicated. I do, however, think that the vote-

-40-

dilution claims pleaded in this case were properly rejected because I agree with Judge Torruella that, on the pleadings and the record, only one conclusion is possible:  the Commission's ruling involved only the <u>clarification</u> of previously unsettled law.  In my view, this is not a "change in the rules" sufficient to implicate federal interests.



| PARTIDO POPULAR DEMOCRÁTICO | | PARTIDO NUEVO PROGRESISTA | | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | | NOMINACIÓN DIRECTA (WRITE IN) |
|---|---|---|---|---|---|---|
| | | SEGURIDAD ESTADIDAD PROGRESO | | PIP | | Se provee esta columna en blanco para que el elector anote en ella el nombre de cualquier otro candidato que desee encasillar, fuera de los que aparecen en las columnas anteriores. (Artículo 5.011 - Ley Electoral) |
| Gobernador de Puerto Rico Aníbal Acevedo Vilá | 1 | Gobernador de Puerto Rico Pedro Rosselló | 1 | Gobernador de Puerto Rico Rubén Berríos Martínez | 1 | Gobernador de Puerto Rico |
| Comisionado Residente Roberto L. Prats Palerm | 2 | Comisionado Residente Luis Fortuño | 2 | Comisionado Residente Edwin Irizarry Mora | 2 | Comisionado Residente |

## INSTRUCCIONES SOBRE LA FORMA DE VOTAR EN LA PAPELETA ELECTORAL ESTATAL

En esta papeleta, usted tiene derecho a votar por un candidato a Gobernador y un candidato a Comisionado Residente.

### COMO VOTAR INTEGRO

Para votar íntegro, usted hace una sola marca (X) válida, en el espacio en blanco bajo la insignia del partido de su preferencia y no hace ninguna otra marca en la papeleta.

### COMO VOTAR MIXTO

Para votar mixto, se hace una marca (X) válida debajo de la insignia del partido de su preferencia y se hace una marca al lado de otro candidato fuera de la columna de su partido, o escribe el nombre de otra persona de su preferencia bajo el cargo correspondiente, en la última columna de Nominación Directa. Tenga en cuenta que sólo puede votar por un (1) candidato a Gobernador y por un (1) candidato a Comisionado Residente.

### COMO VOTAR CANDIDATURA

Cuando el elector no tiene interés en votar bajo la insignia de ningún partido, y desea votar exclusivamente por candidatos, hará una marca (X) válida al lado del candidato o los candidatos de su preferencia, o puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo sus nombres bajo el cargo correspondiente en la columna de Nominación Directa. Tenga en cuenta que sólo puede votar por un candidato para Gobernador y un candidato para Comisionado Residente.

MODELO

COMISIÓN ESTATAL DE ELECCIONES
ELECCIONES GENERALES
PAPELETA ELECTORAL ESTATAL
2 de noviembre de 2004

MODELO

JA    00086